UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| RYAN CARDER, individually and on behalf of all others similarly situated, | Civil Action No.: |
| Plaintiff | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| TMX FINANCE CORPORATE SERVICES, INC. AND TMX FINANCE, LLC, | |
| Defendants. | |

Plaintiff Ryan Carder ("Plaintiff"), on behalf of himself and all others similarly situated, by and through is undersigned counsel, brings this action against TMX Finance Corporate Services, Inc. and TMX Finance, LLC, (collectively "TMX" or "Defendant"). Plaintiff alleges as follows upon personal knowledge as to the facts pertaining to himself, and on information and belief as to all other matters.

I.     **SUMMARY OF THE ACTION**

1.     TMX Finance, LLC, is the parent company of TMX Finance Corporate Services, Inc. TMX Finance, LLC was founded in Savanah Georgia in June 2010 and was

previously known as TMX Holdings, LLC. Through its wholly owned subsidiary, TMX Finance Corporate Services, Inc., TMX Finance, LLC operates several consumer credit and lending businesses.

2.      Defendant TMX Finance Corporate Services, Inc., a wholly owned subsidiary of TMX Finance, LLC, was founded in Savannah, Georgia in June 2010. TMX Finance Corporate Services, Inc., operates several consumer credit and lending businesses including TitleMax, Inc., a lending business headquartered in Dallas, Texas that provides personal loans as well as loans secured by auto and motorcycle titles to residents of Alabama, Arizona, Delaware, Georgia, Idaho, Illinois, Kansas, Mississippi, Missouri, Nevada, New Mexico, South Carolina, Tennessee, Texas, Utah, Virginia, and Wisconsin; InstaLoan, a consumer lending company that offers loans secured by automobile titles, and short term, high interest personal loans to Florida residents; and TitleBucks, a consumer lending company that offers auto title loans to residents of Alabama, Arizona, Georgia, South Carolina, Tennessee, and Texas.

3.      On March 30, 2023, TMX disclosed, for the first time, a cyber-attack that began in December 2022 and resulting in the exfiltration, between February 3, 2023 and February 14, 2023, of the personal identifiable information ("PII") of approximately 4,822,580 consumers (the "Data Breach"). The hackers who undertook the data breach accessed critical PII including, at the very least, names, dates of birth, passport numbers, driver's license numbers, federal/state identification card numbers, tax identification

numbers, social security numbers and/or financial account information, and other information such as phone numbers, addresses, and email addresses.

4.      Plaintiff brings this action on behalf of himself and the class of consumers defined herein (the "Class"), the members of which (the "Class Members") had their PII, including but not limited to, names, dates of birth, passport numbers, driver's license numbers, federal/state identification card numbers, tax identification numbers, social security numbers and/or financial account information, and other information such as phone numbers, addresses, and email addresses disclosed to unauthorized third persons as a result of the Data Breach.

5.      Defendant operates several consumer lending companies that provide, *inter alia*, title lending, short term "payday" loans, and other consumer lending services to consumers.  As a condition of receiving lending services from Defendant, consumers provide their PII to Defendant.

6.      Plaintiff and Class Members entrust this sensitive confidential information to Defendant, which information was compromised and unlawfully accessed due to the Data Breach.  The information remains in the possession of Defendant, despite the fact that it was accessed by unauthorized third persons, and is currently being maintained without appropriate and necessary safeguards, independent review, and oversight, and therefore remains vulnerable to additional hackers and theft.

7.    The Data Breach was a direct result of Defendant's failure to implement adequate and cyber-security procedures and protocols necessary to protect Plaintiff's and Class Members' PII.

8.    The Data Breach occurred because Defendant maintained Class Members' PII in a reckless manner and on its computer networks in a condition that was vulnerable to cyber-attacks. The risk of cyber-attack was well-known to Defendant – and to all financial service companies – and Defendant was continuously on notice at all times material that its failure to take steps necessary to secure the PII from a risk of cyber-attack and unauthorized access left that information and property in a dangerous condition that was vulnerable to theft.

9.    Defendant's failure to protect the PII of consumers is all the more egregious because, not only was Defendant aware of the significant risk of cyber-attacks faced by financial institutions given the sensitive nature of the PII entrusted to them, but Defendant was exposed to another data breach early in 2021, when a file sharing platform operated by one of Defendant's vendors was accessed in an unauthorized data breach.

10.    Nevertheless, and despite this knowledge and recent exposure to a data breach, Defendant continuously disregarded the rights of Plaintiff and Class Members, as more fully defined below, by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that its data systems were protected and safeguarded against unauthorized intrusions, while failing to disclose

that it did not have adequately robust computer systems and security safeguards or practices in place with respect to protecting against the risk of unauthorized access of PII. Defendant further failed to take standard and reasonably available steps to prevent the Data Breach, and failed to properly train its staff and employees on proper security measures. Importantly, Defendant also failed to provide Plaintiff and Class Members with prompt and timely notice of the Data Breach, thereby further injuring them by such delay.

11.     Defendant and its employees failed to properly monitor the computer networking systems on which it housed the PII and, had they done so, would have discovered the intrusion sooner, and would not have permitted cyber thieves to freely access TMX's IT network for a substantial period of time.

12.     Plaintiff's and Class Members' identities are now at risk as a consequence of Defendant's misconduct. Their PII that was collected by the Defendant and maintained at all times material, without adequate safeguards, is now in the hands of cyber thieves – a present risk that will continue throughout their respective life-times.

13.     Defendant was fully aware that data thieves, once armed with PII that they accessed in a data breach, are capable of pursuing numerous types of misconduct and crimes through the unauthorized use and exploitation of that data, including opening new financial accounts in Class Member's names, taking loans in their names, using their names to obtain medical services, obtain government benefits, file fraudulent tax returns in order

to get refunds to which they are not even entitled, and numerous other assorted acts of thievery and fraud.

14.     Plaintiff and Class Members have suffered numerous actual and imminent injuries as a direct result of the Data Breach, including: (a) theft of their PII; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of the Data Breach; (d) invasion of privacy; (e) the emotional distress, stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach; (f) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft posed by their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (g) damages to and diminution in value of their personal data entrusted to Defendant with the mutual understanding that Defendant would safeguard their PII against theft and not allow access to and misuse of their personal data by others; and (h) the continued risk to their PII, which remains in the possession of Defendant, and which is subject to further injurious breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members' PII, and, at the very least, are entitled to nominal damages.

15.     Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals who are Class Members, and further seeks remedies that include, but are not limited to, compensatory damages, nominal damages and reimbursement of out-of-

pocket costs, as well as injunctive and equitable relief to prevent future injury on behalf of himself and the putative class.

## II.    PARTIES

### Plaintiff

16.    Plaintiff Ryan Carder is, and at all times mentioned herein was, a resident of the state of Wisconsin, residing in the City of Fond Du Lac.  Plaintiff applied for a motorcycle title loan through TitleMax, Inc.  As a condition of applying for said loan, Plaintiff was required to provide PII, including his name and Social Security Number, as well as additional information, to TitleMax.  Plaintiff was only recently notified of the Data Breach and that his PII was compromised upon receiving the Notice of the Data Breach. Plaintiff Carder received notification of the Data Breach on or around April 3, 2023.

17.    Since receiving the Notice of the Data Breach, Plaintiff has taken steps to protect himself against identity theft. Plaintiff has also spent time monitoring his financial accounts for signs of fraud or misuse of his PII, time that Plaintiff would have had to expend were it not for the Data Breach.

18.    Since the Data Breach, Plaintiff Carder has noticed significant suspicious activity in his financial accounts, including attempts to use his debit card in the state of New York and other states. As a result of this attempted fraud, Plaintiff Carder has been forced to close financial accounts, an inconvenient and time consuming process. Plaintiff

Carder remains concerned about the fact that the Data Breach has exposed him to a lifetime of fraud risk.

**Defendant**

19.    Defendant TMX Finance, LLC, is the parent company of TMX Finance Corporate Services. TMX Finance, LLC was founded in Savanah Georgia in June 2010 and was previously known as TMX Holdings, LLC. Through its wholly owned subsidiary, TMX Finance Corporate Services, Inc., TMX Finance, LLC operates several consumer credit and lending businesses.

20.    Defendant TMX Finance Corporate Services, Inc., a wholly owned subsidiary of TMX Finance, LLC, was founded in Savannah, Georgia in June 2010. TMX Finance Corporate Services, Inc., operates several consumer credit and lending businesses including TitleMax, Inc., a lending business headquartered in Dallas, Texas that provides personal loans as well as loans secured by auto and motorcycle titles to residents of Alabama, Arizona, Delaware, Georgia, Idaho, Illinois, Kansas, Mississippi, Missouri, Nevada, New Mexico, South Carolina, Tennessee, Texas, Utah, Virginia, and Wisconsin; InstaLoan, a consumer lending company that offers loans secured by automobile titles, and short term, high interest personal loans to Florida residents; and TitleBucks, a consumer lending company that offers auto title loans to residents of Alabama, Arizona, Georgia, South Carolina, Tennessee, and Texas.

## III.    JURISDICTION AND VENUE

21.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy, exclusive of interest and costs, exceeds the sum value of $5,000,000.00, consists of putative class membership of greater than 100 members, and is a class action in which some of the members of the Class, are citizens of states different than that of Defendant.

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant is authorized to conduct business within this District, is headquartered in this District, has intentionally availed itself of the laws in this District, and conducts substantial business, including acts underlying the allegations of this complaint, in this District.

## IV.    FACTUAL ALLEGATIONS

### TMX and Its Business

23.    TMX Finance LLC, is a limited liability corporation headquartered in Savannah, Georgia. TMX Finance Corporate Services, Inc., is a wholly-owned subsidiary of TMX Finance LLC and, through several affiliated companies including TitleMax, TitleBucks, and InstaLoan, provides consumer lending services to consumers through approximately 900 locations in states including Alabama, Arizona, Delaware, Florida, Georgia, Mississippi, Missouri, Nevada, New Mexico, South Carolina, Tennessee, Texas,

Utah, and Wisconsin, and an online presence in Idaho. TMX generally targets consumers who have limited access to traditional forms of consumer credit.

24.    TMX collected, stored, and maintained the PHI provided by Plaintiff and Class Members as a condition of providing services. Such PHI included names and Social Security numbers.

25.    In order to apply for a title loan, personal loan, lien loan, or other form of consumer loan, from TMX, Plaintiff and Class Members were required to and did in fact turn over such PII to Defendant.

26.    Defendant maintains virtually identical privacy policies for TitleMax, TitleBucks, and InstaLoan (collectively the "Privacy Notice").[1] The Privacy Notice provides notice of Defendant's privacy practices with respect to how it handles customer PII. *Id.* In the Privacy Notice, Defendant assures consumers that "[t]o protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings." *Id.*

27.    Defendant was aware at all times material of the fact that the financial industry was at risk of experiencing a cyber-security attack and data breach as many have occurred throughout the United States. Given its maintenance of critical PII and its knowledge of

---

[1]    https://www.tmxdisclosures.com/titlebucks/privacy-policy (last visited, April 5, 2023), https://www.tmxdisclosures.com/instaloan/privacy-policy (last visited, April 5, 2023), and https://www.tmxdisclosures.com/titlemax/privacy-policy (last visited, April 5, 2023).

such risk and its duties, Defendant was responsible for safeguarding the PII in its possession with respect to each Plaintiff and Class Member.

**The Cyber-Attack and Data Breach**

28.    In a Notice of Data Breach letter dated March 30, 2023, TMX Finance acknowledged a massive breach that impacted TMX Finance, "its parent TMX Finance LLC and its affiliates, many of which operate under the brands 'TitleMax,' 'TitleBucks,' and 'InstaLoan'[.]"[2] TMX acknowledged that the breach began no later than early December 2022, that Customer Data "may have been acquired" between February 3, 2023 and February 14, 2023, and that TMX discovered the Data Breach no later than March 1, 2023, but did not begin informing Class members until almost a month later, preventing Class members from taking critical steps to protect . . .

29.    In the Notice Letter, TMX acknowledged that information exfiltrated in the Data Breach may have included, *inter alia*, "your name, date of birth, passport number, driver's license number, federal/state identification card number, tax identification number, social security number and/or financial account information, and other information such as phone number, address, and email address."

---

[2]    A sample of the Notice Letter is attached hereto as Exhibit A.

11

30.    In a notice filed with the office of the Attorney General of the State of Main, TMX acknowledged that the Data Breach affected 4,822,580 consumers.[3]

31.    In response to the ongoing threat posed by the Data Breach, TMX offered Class Members the meager protection of "complimentary credit monitoring and identity protection services through Experian IdentityWorks$^{SM}$ for a period of 12 months." This offer fails to acknowledge the substantial and long term harm and risk of harm facing consumers as a result of the Data Breach.

32.    Plaintiff is informed and believes that the cyber-attack targeted Defendant by reason of its status as a financial institution that collects, creates, and maintains PII, and that such attack was designed to gain access to and infiltrate private and confidential data, including the PII of Plaintiff and Class Members.

33.    Defendant did not state in its Notice of the Data Breach why it was unable to detect the unauthorized individuals accessing Defendant's servers or why it had waited for more than six months before notifying affected patients and members.

34.    The Data Breach occurred as a direct and proximate result of Defendant's failure to prevent the cyber-attack and as a consequence of the fact that it did not adhere to commonly accepted securities standards and otherwise failed to detect that its data bases were subject to a security breach.

---

[3]    https://apps.web.maine.gov/online/aeviewer/ME/40/179ab0ce-2c43-4119-ae5a-db766d4be3e0.shtml (last visited on April 5, 2023).

35.    The significant risk of a cyber-attack and data breach was unquestionably foreseeable to Defendant.

36.    The Data Breach could have been prevented had Defendant properly secured and encrypted Plaintiff's and Class Members' PII, destroyed data, including old data Defendant had no legal right or responsibility to retain.

37.    To prevent and detect cyber-attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users, configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless

absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[4]

38.    To prevent and detect cyber-attacks Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure

---

[4]    How to Protect Your Networks from Ransomware, available at https://www.justice.gov/criminal-ccips/file/872771/download (last visited April 5, 2023).

Security Agency, the following measures:

- Update and patch your computer. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks.

- Use and maintain preventative software programs. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic.[5]

39.    To prevent and detect cyber-attacks attacks Defendant could and should have

implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the

following measures:

**Secure internet-facing assets**
- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;
**Thoroughly investigate and remediate alerts**
- Prioritize and treat commodity malware infections as potential full compromise;
**Include IT Pros in security discussions**
- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;
**Build credential hygiene**
- Use [multifactor authentication] or [network level authentication] and use strong,

randomized, just-in-time local admin passwords;
**Apply principle of least-privilege**
- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs

---

[5]    *See* : Protecting Against Ransomware | CISA, https://www.cisa.gov/news-events/news/protecting-against-ransomware (last visited on April 5, 2023).

- Analyze logon events;
**Harden infrastructure**
- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[6]

40.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

41.    Because Defendant was entrusted with consumers' PII, it had, and has, a duty to protect that PII and keep it secure.

42.    Plaintiff and Class Members reasonably expect that when their PII is provided to Defendant, it will safeguard their PII.

43.    Nonetheless, Defendant failed to prevent the Data Breach. Had Defendant properly maintained and adequately protected its systems, it could have prevented the Data Breach.

---

[6]    *See* Human-operated ransomware attacks: A preventable disaster - Microsoft Security Blog (last visited April 5, 2023); Microsoft Shares Tactics Used in Human-Operated Ransomware Attacks (bleepingcomputer.com) (last visited April 5, 2023).

44.    Given that Defendant was storing the PII of Plaintiff and Class Members, Defendant could and should have implemented all of the above measures to prevent and detect cyber-attacks.

45.    Upon information and belief, the occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of the PII of an undisclosed amount of current and former consumers, including Plaintiff and Class Members.

46.    Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

47.    Defendant's failure to keep secure current and former customers' PII has had and shall continue to have adverse effects that are long lasting and severe. Once Social Security numbers and other PII have been stolen, fraudulent use of that information and damage to victims may continue for years.


**PII is Uniquely Valuable to Hackers**

48.    PII, including names and social security numbers are uniquely valuable to hackers. With these pieces of information, criminals can open new financial accounts in Class Member's names, take loans in their names, use their names to obtain medical

services, obtain government benefits, file fraudulent tax returns in order to get refunds to which they are not even entitled, and numerous other assorted acts of thievery and fraud.

49.    Social Security numbers are among the most sensitive kind of personal information. They are difficult for an individual to change. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against potential misuse of a Social Security number is not permitted; an individual instead must show evidence of actual, ongoing fraud to obtain a new number.[7]

50.    A new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[8]

51.    For this reason, hackers prey on financial institutions and related entities. And financial institutions, like Defendant, have been aware of this, and the need to take adequate measures to secure their systems and information, for a number of years.  In 2021 alone, approximately 279 breaches targeting financial service providers occurred.[9] That

---

[7]    Bryan Naylor, Victims of Social Security Number Theft Find It's Hard to Bounce Back, NPR (Feb. 9, 2015), available at: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions worrying-about-identity-theft (last accessed April 5, 2023)

[8]    *Id.*

[9]    ITRC_2021_Data_Breach_Report.pdf, available at https://www.idtheftcenter.org/wp-content/uploads/2022/04/ITRC_2021_Data_Breach_Report.pdf at 6. (last visited on April 5, 2023).

figure represented a substantial increase from the year before and the year before that.[10] The steady growth of hacks of financial services providers is no surprise and can be tied to two significant factors, (1) the failure of financial services providers, like Defendant, to adequately protect patient data and (2) the substantial value of the sensitive PII entrusted to financial service providers.

52.    In 2021, 1,862 data breaches occurred, resulting in approximately 164,683,455 sensitive records being exposed, an increase of 68% over 2020 and a 23% increase over the previous all-time high.[11] These data breaches exposed the sensitive data of approximately 294 million people. *Id.*   Hackers are increasingly targeting highly sensitive PII, including social security numbers and, in 2021, approximately 1,136 data breaches exposed social security numbers. *Id.*

53.    Financial service providers like TMX are well aware of the risk that data breaches pose to consumers, especially because both the size of TMX's customer base and the fact that the PII that they collect and maintain from their customers is profoundly valuable to hackers.   Indeed, Federal Reserve Chairman Jerome Powell has referred to cyber-attacks as the number one threat to the global financial system.[12]

---

[10]    *Id.*

[11]    ITRC_2021_Data_Breach_Report.pdf, available at https://www.idtheftcenter.org/wp-content/uploads/2022/04/ITRC_2021_Data_Breach_Report.pdf (last visited on April 5, 2023).

[12]    For Financial Institutions, Cyberthreats Loom Large, available at https://www.forbes.com/sites/forbesfinancecouncil/2022/03/09/for-financial-institutions-cyberthreats-loom-large/?sh=dc89a922ddbd (last visited April 5, 2023).

**Plaintiff's Experiences**

54.    Plaintiff typically takes measures to protect his PII and is very careful about sharing his PII.  Plaintiff does not knowingly transmit unencrypted PII over the internet or other unsecured source.

55.    Plaintiff Hernandez stores any documents containing his PII in a safe and secure location. He also diligently chooses unique usernames and passwords for his online accounts.

56.    As a result of the Data Breach, Plaintiff Hernandez has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach. He monitors accounts and credit scores and has sustained emotional distress as a result of worrying about his PII being exfiltrated. He has monitored his account extensively since receiving the Notice of Data Breach from Defendant, and intends to spend time taking steps to protect his PII. This is time that was and will be lost and unproductive and taken away from other activities and duties.

57.    Plaintiff Hernandez has suffered, and will continue to suffer, lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety, emotional distress, and increased concerns for the loss of his privacy.

58.    As a result of the Data Breach and the exfiltration of his unencrypted PII in the hands of criminals, Plaintiff Hernandez is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

59.    To date, Defendant has done very little to adequately protect Plaintiff and Class Members, other than informing them of the availability of free credit reports and offering two years of credit monitoring and identify theft protection, and has done nothing to compensate them for their injuries sustained in this Data Breach.

**Plaintiff's and Class Members' Damages**

60.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences if its data security, or agent's data security systems were breached, including the significant costs that would be imposed on Plaintiff and the Class as a result of the breach.

61.    As a direct and proximate result of Defendant's conduct, Plaintiff and the other Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.  They must be vigilant and review their credit reports for suspected incidents of identity theft, and educate themselves about security freezes, fraud alerts, and other steps to protect themselves against identity theft. This ongoing need for monitoring for identity theft and fraud will extend indefinitely into the future.

62.    Consumers suffer injury from the simple fact that information associated with their financial accounts and identity has been stolen even absent any adverse use. When this type of sensitive information is stolen, accounts become less secure and the information once used to sign up for bank accounts and other financial services is no longer as reliable as it had been before the theft. Consumers must spend time and money to re-secure their financial position and safeguard their standing in the financial community.

63.    Plaintiff and the other Class Members have suffered and will suffer actual injury due to loss of time and increased risk of identity theft as a direct result of the Data Breach. In addition to any fraudulent charges, loss of use of and access to their account funds, costs associated with their inability to obtain money from their accounts, diminution of value of the data, and damage to their credit, Plaintiff and the other Class Members suffer ascertainable losses in the form of out-of-pocket expenses, opportunity costs, and the time and costs reasonably incurred to remedy or mitigate the effects of the Data Breach.

64.    Moreover, Plaintiff and the other Class Members have an interest in ensuring that Defendant implement reasonable security measures and safeguards to maintain the integrity and confidentiality of their PII, including making sure that the storage of data or documents containing PII is not accessible by unauthorized persons and that access to such data is sufficiently protected.

65.     In addition to the remedy for economic harm, Plaintiff and the Class Members maintain an undeniable and continuing interest in ensuring that the PII remains in the possession of Defendant is secure, remains secure, and is not subject to future theft.

## V.     CLASS ALLEGATIONS

66.     Pursuant to Fed. R. Civ. P. 23(b)(1), (b)(2), (b)(3), and (c)(4), Plaintiff asserts common law claims on behalf of himself and all Class Members for negligence (Count I), breach of implied contract (Count II), and breach of fiduciary duty (Count III), on behalf of the Nationwide Class defined below. In the alternative, Plaintiff brings claims on behalf of the Wisconsin Class defined below:

**Nationwide Class**: All residents of the United States whose PII was accessed or otherwise compromised as a result of the Data Breach.

**Wisconsin Class**: All residents of the state of Wisconsin whose PII was accessed or otherwise compromised as a result of the Data Breach

Members of the Nationwide Class and the Wisconsin Class are referred to herein collectively as "Class Members" or "Class."

67.     Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns.  Also excluded from the Class is any judge, justice, or judicial

officer presiding over this matter and the members of their immediate families and judicial staff.

68. The proposed Class meets the requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and (c)(4).

69. **Numerosity**: The exact number of members of the Class is unknown to Plaintiff at this time but, on or about March 30, 2023, Defendant acknowledged in a notice provided to the Attorney General of Maine that the number of "persons affected" by the Data Breach was 4,822,580, indicating that there are more than 4.8 million members of the Nationwide Class, making joinder of each individual impracticable.[13] There are hundreds of thousands of members of the Class, making joinder of each individual impracticable. Ultimately, members of the Class will be easily identified through Defendant' records.

70. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a) Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

b) Whether and to what extent Defendant had a duty to protect the PII of Plaintiff

---

[13]     https://apps.web.maine.gov/online/aeviewer/ME/40/179ab0ce-2c43-4119-ae5a-db766d4be3e0.shtml (last visited on April 5, 2023).

and Class Members;

c)  Whether Defendant had duties not to disclose the PII of Plaintiff and Class Members, respectively, to unauthorized third parties;

d)  Whether Defendant had a duty not to use the PII of Plaintiff and Class Members for non-business purposes;

e)  Whether and when Defendant learned of the Data Breach;

f)  Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g)  Whether Defendant committed violations by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h)  Whether Defendant failed to implement and maintain reasonable security procedures and practices adequate to protect the information compromised in the Data Breach, considering its nature and scope;

i)  Whether Defendant has adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j)  Whether Defendant engaged in unfair, unlawful, or deceptive practices, including by failing to safeguard the PII of Plaintiff and Class Members;

k)  Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct, and if so, in what amount;

l) Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct, and if so, in what amount; and

m) Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

71.    **Typicality**: Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and the Class Members sustained damages as a result of Defendant's uniform wrongful conduct during transactions with them.

72.    **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and there are no defenses unique to Plaintiff.   Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the members of the proposed Class, and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class.

73.    **Risks of Prosecuting Separate Actions**: This case is appropriate for certification because prosecution of separate actions would risk either inconsistent adjudications which would establish incompatible standards of conduct for the Defendant or would be dispositive of the interests of members of the proposed Class. Furthermore, Defendant still collects and maintains the PII of Plaintiff, the Class and other consumers in

the course of its business and is still vulnerable to future attacks – one standard of conduct is needed to ensure the future safety of the PII entrusted to Defendant.

74. **Policies Generally Applicable to the Class**: This case is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Plaintiff and proposed Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct towards members of the Class, and making final injunctive relief appropriate with respect to the proposed Class as a whole. Defendant' practices challenged herein apply to and affect the members of the Class uniformly, and Plaintiff's challenge to those practices hinges on Defendant's conduct with respect to the proposed Class as a whole, not on individual facts or law applicable only to Plaintiff.

75. **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and the members of the Class. The injuries suffered by each individual member of the Class are relatively small in comparison to the burden and expense of individual prosecution of the litigation necessitated by Defendant's conduct. Absent a class action, it would be virtually impossible for individual members of the Class to obtain effective relief from Defendant. Even if Class Members could sustain individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties, including the Court, and would require

duplicative consideration of the common legal and factual issues presented here. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court.

76.    **Manageability**: Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

77.    The Class may be certified pursuant to Rule 23(b)(2) because Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief appropriate with respect to the claims raised by the Class.

78.    The Class may also be certified pursuant to Rule 23(b)(3) because questions of law and fact common to the Class will predominate over questions affecting individual members, and a class action is superior to other methods for fairly and efficiently adjudicating the controversy and causes of action described in this Complaint.

79.    Particular issues under Rule 23(c)(4) are appropriate for certification because such claims present particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## VI.    CAUSES OF ACTION

### Negligence
### (On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Wisconsin Class)

80.    Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 79.

81.    As a condition of receiving their loans or other financial services from Defendant, Defendant's current and former customers were obligated to provide and entrust Defendant with certain PII, including their name, Social Security number, and other PII and financial information in connection with a loan application, loan modification, other items regarding loan servicing, or other financial services.

82.    Plaintiff and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

83.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed or obtained by unauthorized parties.

84.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of its current and former customers' PII involved an unreasonable risk of harm to Plaintiff and the Class, including harm that foreseeably could occur through the criminal acts of a third party.

85.    Defendant had a duty to exercise reasonable care in safeguarding, securing,

and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that Plaintiff's and Class Members' information in Defendant's possession was adequately secured and protected.

86.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII it was no longer required to retain pursuant to regulations.

87.    Defendant had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiff's and the Class's PII, and to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiff and the Class.

88.    Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII, a mandatory step in obtaining services from Defendant.

89.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff and the Class, to maintain adequate data security.

90.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

91.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of

the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of adequately safeguarding that PII, and the necessity of encrypting PII stored on Defendant's systems.

92.    Defendant's own conduct created a foreseeable risk of harm to Plaintiff and the Class. Defendant's wrongful conduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decision not to comply with industry standards for the safekeeping of Plaintiff's and the Class's PII, including basic encryption techniques available to Defendant.

93.    Plaintiff and the Class had no ability to protect their PII that was in, and remains in, Defendant's possession.

94.    Defendant was in a position to effectively protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

95.    Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiff and the Class within Defendant's possession was compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

96.    Defendant has admitted that the PII of Plaintiff and the Class was wrongfully accessed by unauthorized third persons as a result of the Data Breach.

97.     Defendant, through its actions and inaction, unlawfully breached its duties to Plaintiff and the Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiff and the Class when the PII was within Defendant's possession or control.

98.     Defendant improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

99.     Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect its current and former customers' PII in the face of increased risk of theft.

100.    Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and the Class by failing to have appropriate procedures in place to detect and prevent dissemination of its current and former customers' PII.

101.    Defendant breached its duty to exercise appropriate clearinghouse practices by failing to remove former customers' PII it was no longer required to retain pursuant to regulations.

102.    Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiff and the Class the existence and scope of the Data Breach.

103.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff

and the Class, the PII of Plaintiff and the Class would not have been compromised.

104.    There is a close causal connection between (a) Defendant's failure to implement security measures to protect the PII of Plaintiff and the Class and (b) the harm or risk of imminent harm suffered by Plaintiff and the Class. Plaintiff's and the Class' PII was accessed and exfiltrated as the direct and proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

105.    Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of businesses, such as Defendant, of failing to implement reasonable measures to protect PII. The FTC Act and related authorities form part of the basis of Defendant's duty in this regard.

106.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the damages that would result to Plaintiff and the Class.

107.    Defendant's violation of Section 5 of the FTC Act constitutes negligence per se.

108.    Plaintiff and the Class are within the class of persons that the FTC Act was

intended to protect.

109.   The harm that occurred as a result of the Data Breach is the type of harm the

FTC Act was intended to guard against. The FTC has pursued enforcement actions against

businesses, which, as a result of their failure to employ reasonable data security measures

and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff

and the Class.

110.   As a direct and proximate result of Defendant's negligence and negligence

per se, Plaintiff and the Class have suffered and will suffer injury, including but not limited

to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the

compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated

with the prevention, detection, and recovery from identity theft, tax fraud, and/or

unauthorized use of their PII; (v) lost opportunity costs associated with effort expended

and the loss of productivity addressing and attempting to mitigate the present and future

consequences of the Data Breach, including but not limited to efforts spent researching

how to prevent, detect, contest, and recover from tax fraud and other identity theft; (vi)

costs associated with placing freezes on credit reports; (vii) the continued risk to their PII,

which remains in Defendant's possession and is subject to further unauthorized disclosures

so long as Defendant fails to undertake appropriate and adequate measures to protect the

current and former customers' PII in its continued possession; and (viii) present and future

costs in the form of time, effort, and money that will be expended to prevent, detect,

contest, and repair the impact of the compromise of PII as a result of the Data Breach for the remainder of the lives of Plaintiff and the Class Members.

111.   As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

112.   Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

113.   As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff is now at an increased risk of identity theft or fraud.

114.   As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff is entitled to and demand actual, consequential, and nominal damages and injunctive relief to be determined at trial.

**COUNT II**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Wisconsin Class)**

115.   Plaintiff and the Class re-allege and incorporate by reference herein all of the

allegations contained in paragraphs 1 through 79.

116.    Defendant acquired and maintained the PII of Plaintiff and the Class, including name, Social Security number, and other PII, including their name, Social Security number, and other PII and financial information in connection with a loan application, loan modification, other items regarding loan servicing, or other financial services.

117.    At the time Defendant acquired the PII of Plaintiff and the Class, there was a meeting of the minds and a mutual understanding that Defendant would safeguard the PII and not take unjustified risks when storing the PII.

118.    Plaintiff and the Class would not have entrusted their PII to Defendant had they known that Defendant would make the PII internet-accessible, not encrypt sensitive data elements such as Social Security numbers, and not delete the PII that Defendant no longer had a reasonable need to maintain.

119.    Prior to the Data Breach, Defendant published the Privacy Notice, agreeing to protect and keep private financial information of Plaintiff and the Class.

120.    Defendant further promised to protect Plaintiff's and Class Members' PII through the use of computer safeguards and secured files and buildings.

121.    Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized

disclosures of the PII, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, and (f) retain the PII only under conditions that kept such information secure and confidential.

122.  In collecting and maintaining the PII of Plaintiff and the Class and publishing the Privacy Notice, Defendant entered into contracts with Plaintiff and the Class requiring Defendant to protect and keep secure the PII of Plaintiff and the Class.

123.  Plaintiff and the Class fully performed their obligations under the contracts with Defendant.

124.  Defendant breached the contracts they made with Plaintiff and the Class by failing to protect and keep private financial information of Plaintiff and the Class, including failing to (i) encrypt or tokenize the sensitive PII of Plaintiff and the Class, (ii) delete such PII that Defendant no longer had reason to maintain, (iii) eliminate the potential accessibility of the PII from the internet where such accessibility was not justified, and (iv) otherwise review and improve the security of the network system that contained such PII.

125.  As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and the Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting

in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; additional time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, credit freezes, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

126.   As a direct and proximate result of Defendant's breach of contract, Plaintiff is at an increased risk of identity theft or fraud.

127.   As a direct and proximate result of Defendant's breach of contract, Plaintiff is entitled to and demand actual, consequential, and nominal damages and injunctive relief, to be determined at trial.

## COUNT III
## Breach of Fiduciary Duty
### (On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Wisconsin Class)

128.   Plaintiff and the Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 79.

129.   A relationship existed between Plaintiff and the Class and Defendant in which Plaintiff and the Class put their trust in Defendant to protect the private information of Plaintiff and the Class. Defendant accepted that trust and the concomitant obligations.

130.   Plaintiff and the Class entrusted their PII to Defendant on the premise and

with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and not disclose their PII to unauthorized third parties.

131.   Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

132.   Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of its current and former customers' PII involved an unreasonable risk of harm to Plaintiff and the Class, including harm that foreseeably could occur through the criminal acts of a third party.

133.   Defendant's fiduciary duty required it to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that Plaintiff's and the Class's information in Defendant's possession was adequately secured and protected.

134.   Defendant also had a fiduciary duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiff's and the Class's PII. Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII, a necessary part of

obtaining services from Defendant, and because Defendant was the only party in a position to know of its inadequate security measures and capable of taking steps to prevent the Data Breach.

135.    Defendant breached the fiduciary duty that it owed to Plaintiff and the Class by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect the private information of Plaintiff and the Class.

136.    Defendant's breach of fiduciary duty was a legal cause of damage to Plaintiff and the Class.

137.    But for Defendant's breach of fiduciary duty, the damage to Plaintiff and the Class would not have occurred.

138.    Defendant's breach of fiduciary duty contributed substantially to producing the damage to Plaintiff and the Class.

139.    As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiff is entitled to and demand actual, consequential, and nominal damages and injunctive relief, to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and all Class Members, requests judgment against Defendant and that the Court grant the following:

A.  For an Order certifying the Class as defined herein, and appointing Plaintiff and their counsel to represent the Class;

B.  For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and the Class Members' PII, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and the Class Members;

C.  For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

    i.  prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.  requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.  requiring Defendant to delete, destroy, and purge the personally identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy

interests of Plaintiff and Class Members;

iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the personally identifying information of Plaintiff and Class Members;

v.    prohibiting Defendant from maintaining Plaintiff's and Class Members' personally identifying information on a cloud-based database;

vi.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.    requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network

is compromised, hackers cannot gain access to other areas of Defendant's systems;

x.   requiring Defendant to conduct regular database scanning and securing checks; xi.   requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personally identifying information, as well as protecting the personally identifying information of Plaintiff and Class Members;

xi.   requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.   requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personally identifying information;

xiii.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to

        appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.    requiring Defendant to adequately educate all Class Members about the threats that they face as a result of the loss of their confidential personally identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and, for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to Class Counsel, and to report any material deficiencies or noncompliance with the Court's final judgment;

D.    For an award of damages, including actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E.    For an award of reasonable attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.


## VII.  DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.


DATED:  April 6, 2023                Respectfully submitted,


                                    **MORGAN AND MORGAN**
                                    /s/ C. Ryan Morgan
                                    C. RYAN MORGAN
                                    Georgia Bar No.: (No. 711884)
                                    200 Stephenson Ave, Suite 200
                                    Savannah, GA 31405
                                    (912) 443-1006
                                    rmorgan@forthepeople.com

                                    **MORGAN & MORGAN**
                                    **COMPLEX BUSINESS DIVISION**
                                    John A. Yanchunis*
                                    Ryan D. Maxey*
                                    201 N. Franklin Street, 7th Floor
                                    Tampa, Florida 33602
                                    (813) 223-5505
                                    jyanchunis@ForThePeople.com
                                    rmaxey@ForThePeople.com

                                    **BARRACK, RODOS & BACINE**
                                    STEPHEN R. BASSER*
                                    SAMUEL M. WARD*
                                    600 West Broadway, Suite 900
                                    San Diego, CA  92101

sbasser@barrack.com
sward@barrack.com
Telephone: (619) 230-0800
Facsimile: (619) 230-1874

**BARRACK, RODOS & BACINE**
ANDREW J. HEO*
Two Commerce Square
2001 Market Street, Suite 3300
Philadelphia, PA 19103
aheo@barrack.com
Telephone: (215) 963-0600
Facsimile: (215) 963-0838


**EMERSON FIRM, PLLC**
JOHN G. EMERSON*
2500 Wilcrest, Suite 300
Houston, TX 77042
Phone: 800-551-8649
Fax: 501-286-4659

*Counsel for Plaintiff Ryan Carder*

*\*Pro Hac Vice* application to be filed

JS 44   (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| Ryan Carder, individually and on behalf of all others similarly situated, | TMX Finance Corporate Services, Inc. and TMX Finance, LLC |

**(b)**  County of Residence of First Listed Plaintiff    Fond du Lac, WI
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*
Morgan and Morgan, 200 Stephenson Ave, Suite 200, Savannah, GA 31405, (912) 443-1006
Barrack, Rodos & Bacine, 600 W. Broadway, Ste 900, San Diego, CA 92101, (619) 230-0800

Attorneys *(If Known)*

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
        Plaintiff

☐ 3   Federal Question
        *(U.S. Government Not a Party)*

☐ 2   U.S. Government
        Defendant

☒ 4   Diversity
        *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) |
| | | | | ☐ 862 Black Lung (923) |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | |
| | | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | |

OTHER STATUTES (continued):
☐ 890 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 485 Telephone Consumer Protection Act
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☒ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

## V.  ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original Proceeding
☐ 2   Removed from State Court
☐ 3   Remanded from Appellate Court
☐ 4   Reinstated or Reopened
☐ 5   Transferred from Another District *(specify)*
☐ 6   Multidistrict Litigation - Transfer
☐ 8   Multidistrict Litigation - Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C § 1332(d)
Brief description of cause:
Action arising from data breach

## VII.  REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
5,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes   ☐ No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____  DOCKET NUMBER _____

DATE
04/06/2023

SIGNATURE OF ATTORNEY OF RECORD
*/s/ C. Ryan Morgan*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____