## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | |
|---|---|
| Patsie Eslinger, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TMX Finance LLC and TMX Finance Corporate Services, Inc.,<br><br>Defendants. | **Case No.**<br><br>**COMPLAINT – CLASS ACTION**<br><br>**Jury Trial Demanded** |

Plaintiff Patsie Eslinger ("Plaintiff"), by and through her attorneys of record, upon personal knowledge as to her own acts and experiences, and upon information and belief as to all other matters, files this Class Action Complaint against Defendant TMX Finance LLC and TMX Finance Corporate Services, Inc. (collectively, "Defendants" or "TMX") and alleges the following.

### INTRODUCTION

1.     TMX is the parent company of a series of brands that offer loans to individuals with low income and low credit scores that are unable to obtain loans from banks and other traditional sources.  Specifically, TMX contends that it provides "access to credit for consumers who are underserved by traditional lenders" including those who "have nowhere else to turn when they suffer short-term financial setbacks like medical emergencies or home repairs[.]"[1]  TMX's brands

---

[1] https://www.tmxfinancefamily.com/what-we-do/#:~:text=The%20TMX%20Finance%20Family%20of%20Companies%20has%20two%20corporate%20offices,of%20Dallas%2D%20Carrollton%2C%20Texas.

1

include TitleMax, TitleBucks, (both described as one of the nation's largest lending companies)[2] and InstaLoan.

2.       TMX, through its brands, purports to have over 1,100 stores in fifteen different states, including Alabama, Arizona, Delaware, Florida, Georgia, Mississippi, Missouri, Nevada, New Mexico, South Carolina, Tennessee, Texas, Utah, and Wisconsin.   Consequently, TMX serves tens of thousands of individuals annually.   Indeed, TitleBucks claims to have severed hundreds of thousands of consumers over the past decade alone.[3]

3.       In order to obtain a loan through TMX, as with most other lenders, TMX requires its customers to provide highly sensitive and Personally Identifying Information ("PII").   This includes names, addresses, phone numbers, and email address and, additionally, highly personal and sensitive information like dates of birth, driver's license or other identification numbers, and social security numbers.   TMX may also collect other financial and tax information.

4.       Upon customers' provision of their sensitive PII, TMX gathers, stores, and uses that information to operate its business and provide its services. As the overseer of that sensitive data, TMX is the only entity capable of adequately protecting it from wrongdoers, and thus, has a duty to implement reasonable data security measures.

5.       Moreover, TMX knew or should have known of the serious need to protect its customers' PII against harm.  The value of this information, particularly customers' social security numbers, is well recognized in the modern data economy, and the foreseeable risk to customers' identities as a result of a criminal hacking event is well-known.   Indeed, entities like TMX are

---

[2] https://www.titlebucks.com/about-us/; https://www.titlemax.com/about-us/
[3] https://www.titlebucks.com/about-us/

highly targeted because they contain a repository of sensitive information on millions of individuals.

6.    TMX, however, failed to do so.  On or around March 30, 2023, TMX disclosed that it had suffered a data breach lasting from December 2022 to at least February 14, 2023 ("Data Breach").[4]  The Data Breach impacted 4.8 million of its customers, including Plaintiff and the Class, and resulted in the theft of highly sensitive information, including: names, dates of birth, passport numbers, driver's license numbers, federal/state identification card numbers, tax identification numbers, social security numbers, financial account information, and contact information including phone numbers, addresses, and email addresses.[5]

7.    This information, having been copied and taken from TMX, is now in the hands of cybercriminals fully capable of using that information on a host of fraud and identity theft schemes, or selling it to other criminals on the dark web.  Consequently, Plaintiff and the Class remain at a prolonged and substantial risk that their information will be misused for fraud.

8.    Plaintiff is one of TMX's customers impacted by the Data Breach.  As a direct and proximate result of TMX's wrongful actions and omissions here, Plaintiff and the Class have suffered, and will continue to suffer, ascertainable losses, economic damages, and other actual injury and harm, including, inter alia: (i) from the untimely and inadequate notification of the Data Breach, (ii) the resulting immediate and continuing risk of future ascertainable losses, economic damages and other actual injury and harm, (iii) the opportunity cost and value of lost time they must spend to monitor their financial accounts and other accounts—for which they are entitled to

---

[4] https://www.documentcloud.org/documents/23735720-tmx-finance-sample-copy-of-individual-notice-l01
[5] *Id.*

compensation; and (iv) out-of-pocket expenses for securing identity theft protection and other similar necessary services.

9.    Consequently, Plaintiff brought this action against Defendants asserting: (1) negligence, (2) negligence *per se*, and (3) injunctive/ declaratory relief.

## JURISDICTION

10.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, which affords federal courts with original jurisdiction over cases where any member of the plaintiff class is a citizen of a state different from any defendant, and where the amount in controversy exceeds $5,000,000, exclusive of interest and costs.  Here, TMX's data breach impacted customers across the United States and, therefore, at least one member of the Class is diverse from Defendants, both of whom are citizens of Georgia.

11.    This Court has general personal jurisdiction over Defendants because they are headquartered and operate their principal place of business in Savannah, Georgia.  TMX has minimum contacts with Georgia because it is located there and conducts substantial business there, and Plaintiff's claims arise from TMX's conduct in Georgia.

12.    Defendant TMX Finance Corporate Services, Inc. is a corporation organized under the laws of Delaware, and its United States headquarters, and principal place of business are located at 15 Bull St., Ste. 200, Savannah, Georgia 31401.[6] Defendant TMX Finance Corporate Services, Inc., can be served *via* its Registered Agent, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA 30092. Defendant TMX Finance Corporate Services, Inc. is a citizen of the States of Georgia and of Delaware.

---

[6] https://www.sec.gov/Archives/edgar/data/1511967/000110465913024898/a12-29657_110k.htm (last visited April 5, 2023).

13.     Defendant TMX Finance, LLC, is a corporation organized under the laws of Delaware, and its United States headquarters, and principal place of business are located at 15 Bull St., Ste. 200, Savannah, Georgia 31401.[7] Defendant TMX Finance, LLC can be served *via* its Registered Agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE, 19808. Defendant TMX Finance, LLC is a citizen of the States of Georgia and of Delaware.

14.     Defendant TMX Finance, LLC's sole member is TMX Finance Holdings, Inc., a corporation incorporated in Delaware with a principal place of business at 15 Bull St., Ste. 200, Savannah, Georgia 31401.[8] TMX Finance Holdings, Inc. is a citizen of the States of Georgia and of Delaware.

15.     This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District and because Defendants conducts a substantial part of its business within this District.

## PARTIES

16.     **Plaintiff** Patsie Eslinger resides in and is a citizen of Georgia.  She is a former customer of Defendant.  On March 30, 2023, TMX sent her a notice stating that her personal information, including her social security number, was among the data exposed during the Data Breach.  Following the Data Breach, Plaintiff started receiving a large amount of spam calls and her Facebook account was hacked.  She also changed her bank account and her passwords due to the extent of her personal information that was compromised.  Plaintiff has not previously received notice that she was the victim of a data breach and has not previously been the victim of identity theft.  Plaintiff has spent time and effort investigating and responding to the risk caused by the

---

[7] *Id.*
[8] *Id.*

Data Breach.  She will have to continue to monitor her accounts for identity theft and fraud for a prolonged period of time.

17.    **Defendant** TMX Financial LLC, is a loan company that oversees several brands, including TitleMax, TitleBucks, and InstaLoan.  Its principal place of business is at 15 Bull Street, Suite 200, Savannah, GA, 31401.  TMX Financial LLC is the parent of TMX Finance Corporate Services, Inc.

18.    **Defendant** TMX Finance Corporate Services, Inc. is a subsidiary of TMX Financial LLC and is affiliated with TitleMax, TitleBucks, and InstaLoan.  It is a Georgia company headquartered at 15 Bull Street, Suite 200, Savannah, GA, 31401.

## FACTUAL BACKGROUND

**A.    TMX Exposed Its Customers Sensitive Information to Cybercriminals**

19.    TMX claims to "Help People" and that it "strive[s] to create new and better opportunities for [its] customers[.]"[9]  Through its subsidiaries, TitleMax, TitleBucks, and InstaLoan, TMX purports to "provide[] access to credit for consumers who are underserved by traditional lenders" that "have nowhere else to turn."[10]  To serve its customers, it purports to promote "[i]ntegrity in all facets of operations" and "[r]espect for the customers, associates, and company."[11]

20.    To offer its loans, TMX requires highly sensitive PII from its customers, including contact information, financial information, and other sensitive information like social security numbers, driver's license, or other government-issued identification numbers.

---

[9] https://www.tmxfinancefamily.com/what-we-do/
[10] *Id.*
[11] *Id.*

21.     TMX collects, stores, and maintains the PII it obtains, including the PII obtained from its subsidiaries and affiliates, TitleMax, TitleBucks, and InstaLoan.  As such, TMX has a massive repository of highly sensitive PII, a particularly lucrative target for cybercriminals.  TMX, as the overseer of this information, is the only entity capable of protecting it.

22.     TMX acknowledges its need to protect this information.  In its SEC filings, it states that is "subject to federal and state laws and regulations related to the recording and reporting of certain financial transactions and the privacy of customer information."  It, for example, acknowledges that under the Gramm-Leach-Bliley Act, it must adhere to certain regulations related to "privacy and data security" and to "disclose to [its] customers [its] privacy policy and practices."  If, furthermore, "must ensure that [its] systems are designed to protect the confidentiality of customers' nonpublic personal information[.]"  It also acknowledges that its businesses operate "under a variety of state statues and regulations" including those related to "privacy and data security of personal consumer information."

23.     Despite its knowledge of the need to protect customer PII, TMX failed to do so.

24.     On February 13, 2023, TMX detected suspicious activity on its systems, prompting it to investigate the incident.  During the investigation of a "global forensic security team," TMX learned it had actually been breached much earlier, in December 2022.  Thus, for two months, cybercriminals roamed freely in TMX's servers and networks undetected.

25.     From February 3 to February 14, 2023, the cybercriminals successfully acquired a swath of sensitive PII on TMX's customers, including: full name, date of birth, passport number, federal/state identification card number, tax identification number, social security number, financial account number, phone number, physical address, and email address.

26.     This information was taken on 4.8 million of TMX's customers.

27.     Although TMX "believes" the incident has been contained, at least as of March 30, 2023, it could not be completely confirmed.

28.     On March 30, 2023, TMX sent out notices to the millions of impacted individuals, including Plaintiff.

29.     The Notice recommended that recipients enroll in credit and identity theft monitoring, and monitor and protect their personal information.  TMX warns its customers to "remain vigilant against potential identity theft and fraud by carefully reviewing credit reports and account statements to ensure that all activity is valid."

30.     As TMX acknowledges by virtue of its recommendations in the notice, Plaintiffs are at a substantial risk of harm due to the misuse of their information.

**B.     TMX's Data Breach Caused Plaintiff and the Class Harm**

31.     TMX's Data Breach resulted in the theft and exposure of confidential data, including social security numbers and financial information.  Exposure of this type of data puts individuals at a significant and prolonged risk of fraud and identity theft.  Indeed, personal and financial information like that stolen from TMX is valuable and has been commoditized in recent years because of its use in conducting identity theft and fraud.

32.     After a data breach like TMX's, the hackers responsible for the breach increasingly seek to sell the stolen personal and sensitive records on the black market to purchasers looking to use the personally identifying information to create fake IDs, make fraudulent transactions, obtain loans or commit other acts of identity theft.[12]

---

[12] *How do hackers make money from your stolen data?*, Emsisoft.com (Feb. 20, 2020), https://blog.emsisoft.com/en/35541/how-do-hackers-make-money-from-your-stolen-data/

33.     Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes.  Personal and sensitive data, like the type exposed in TMX's Data Breach, is a valuable commodity to identity thieves, particularly when it is aggregated in large numbers and including data not found in other breaches. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud, and can use stolen usernames and passwords to steal additional personal and sensitive information from other applications and websites.[13]

34.     Consequently, stolen personal and sensitive data is often trafficked and sold on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the "dark web" due to this encryption, which allows users and criminals to conceal identities and online activity.

35.     Stolen sensitive data sold on the dark web has proven to be valuable.  For instance, cybercriminals on the dark web have sold Social Security numbers (which TMX's Data Breach exposed) for up to $300 per number to be used on fraudulent tax returns.

36.     The Federal Trade Commission ("FTC") has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner, Pamela Jones Harbour, underscored this point by reiterating that "most consumers cannot begin to

---

[13] FTC Consumer Information, *What to Know about Identity Theft*, ftc.gov (last visited, Aug. 13, 2021), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft

comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[14]

37.    Given the value of that data, a robust cyber black market exists in which criminals openly post and purchase stolen personal information and other protected financial information on the dark web.

38.    As such, the ramifications of Defendant's failure to keep Plaintiff's and the Class's personal and financial information secure are severe.

39.    When sensitive personal and financial data is stolen, the risk of identity theft is lasting.  The U.S. Government Accountability Office's research into the effects of data breaches found that "in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.

40.    Once stolen data has been sold or posted on the web, fraudulent use of that information may continue for years.  As a result, studies that attempt to measure the harm resulting from data breaches cannot rule out the significant risk of future harm."[15]  Indeed, according to experts, one out of four data breach notification recipients are later victimized by identity fraud.[16]

41.    Additionally, after personal and financial information is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can allow hackers to harvest additional sensitive and confidential

---

[14] Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009) (last visited Sept. 22, 2021), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

[15] Report to Congressional Requesters, Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown 29 (Jun. 2007), http://www.gao.gov/new.items/d07737.pdf (last accessed Nov. 30, 2018).

[16] *Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims*, ThreatPost.com (last visited Sept. 22, 2021), https://threatpost.com/study-shows-one-four-who-receive-data-breach-letter-become-fraud-victims-022013/77549/

information from the victim, as well as the personal information of family, friends, and colleagues of the initial victim.

42.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Defendant here did not rapidly report to Plaintiff and the Class that their personal and financial information had been stolen.

43.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.  Using data stolen in data breaches like TMX's, hackers and other wrongdoers may use consumers' personal and financial information to siphon money from existing accounts, open new accounts in the names of their victims, or sell consumers' personal and financial information to others who do the same.

44.    Victims of identity theft often suffer indirect financial costs as well, including the costs incurred due to litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit.

45.    In addition to out-of-pocket expenses that can exceed thousands of dollars for the victim of new account identity theft, and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their personal and financial information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for

future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

46.     Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen personal and financial information. To protect themselves, Plaintiff and the Class will need to be remain vigilant against unauthorized data use for years or even decades to come.

47.     The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making.[17] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry unapproved activity; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[18]

48.     According to the FTC, unauthorized personal and financial information disclosures wreak havoc on consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.[19] The FTC, as such, treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

---

[17] *Start With Security, A Guide for Business*, FTC (last visited Sept. 22, 2021), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[18] *Id.*
[19] Taking Charge, What to Do If Your Identity is Stolen, FTC, at 3 (2012) (last visited Sept. 22, 2021), www.consumer.ftc.gov/articles/pdf-0009-taking-charge.pdf.

49.     To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. See *In the matter of Lookout Services, Inc.*, No. C-4326, ⁋ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc*., No. C-4157, ⁋ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); In the matter of The TJX Cos., Inc., No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc*., No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all preceded TMX's Data Breach, further clarify the measures businesses must take to meet their data security obligations.

50.     Consumers place a high value on their PII and a greater value on their PHI, in addition to the privacy of their personal and financial information. Research shows how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that

"[a]mong U.S. subjects, protection against errors, improper access, and secondary use of personal information is worth US $30.49–44.62."[20]

51.     By virtue of the Data Breach here and unauthorized release and disclosure of the personal and financial information of Plaintiff and the Class, TMX deprived Plaintiff and the Class of the substantial value of their personal and financial information, to which they are entitled. As previously alleged, TMX failed to provide reasonable and adequate data security, pursuant to and in compliance with industry standards and applicable law.

52.     Identity theft associated with data breaches is particularly pernicious due to the fact that the information is made available, and has usefulness to identity thieves, for an extended period of time after it is stolen.

53.     As a result, victims suffer immediate and long-lasting exposure and are susceptible to further injury over the passage of time.

54.     Even absent any adverse use, consumers suffer injury from the simple fact that information associated with their financial accounts and identity has been stolen. When personal and financial information is stolen, accounts become less secure, and the information once used to sign up for bank accounts and other financial services is no longer as reliable as it had been before the theft. Thus, consumers must spend time and money to re-secure their financial position and rebuild the good standing they once had in the financial community.

55.     As a direct and proximate result of TMX's wrongful actions and omissions here, Plaintiff and the Class have suffered, and will continue to suffer, ascertainable losses, economic

---

[20] Il-Horn Hann et al., *The Value of Online Information Privacy* (Oct. 2002) available at http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited Sept. 22, 2021); *see also* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22 (2) Information Systems Research 254, 254 (June 2011).

damages, and other actual injury and harm, including, inter alia: (i) from the untimely and inadequate notification of the Data Breach, (ii) the resulting immediate and continuing risk of future ascertainable losses, economic damages and other actual injury and harm, (iii) the opportunity cost and value of lost time they must spend to monitor their financial accounts and other accounts—for which they are entitled to compensation; and (iv) out-of-pocket expenses for securing identity theft protection and other similar necessary services.

## CLASS ALLEGATIONS

56.    Plaintiff brings this action on behalf of themselves and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following Nationwide Class:

> All individuals that received or were otherwise sent notice that their data was potentially compromised due to TXM's Data Breach.

57.    Excluded from the class is TXM and its subsidiaries and affiliates; all employees of TMX; all persons who make a timely election to be excluded from the class; government entities; and the judge to whom this case is assigned and his/her immediate family and court staff.

58.    Plaintiff reserves the right to, after conducting discovery, modify, expand or amend the above Class definition or to seek certification of a class or subclasses defined differently than above before any court determines whether certification is appropriate.

59.    **Numerosity**.  Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. Plaintiff believes that there are millions of members of the Nationwide Class.  The number of reportedly impacted individuals already exceeds 2 million U.S. users who received notice from TMX that their information was impacted in the Data Breach.  The precise number of class members, however, is not yet known to Plaintiff.  Class members may be identified through

objective means and, in fact, TMX, has already provided notice to individuals affected by the Data Breach. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

60.     **Commonality and Predominance**.  Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, this action involves common questions of law and fact which predominate over any questions affecting individual Class members.  These common questions include, without limitation:

    a.    Whether TMX knew or should have known that its data environment and cybersecurity measures created a risk of a data breach;

    b.    Whether TMX controlled and took responsibility for protecting Plaintiff's and the Class's data when it obtained that data from lenders, collected it separately, and stored it on its servers;

    c.    Whether TMX's security measures were reasonable in light of the FTC data security recommendations, state laws and guidelines, industry standards, and common recommendations made by data security experts;

    d.    Whether TMX owed Plaintiff and the Class a duty to implement reasonable security measures;

    e.    Whether TMX's failure to adequately secure Plaintiff's and the Class's data constitutes a breach of its duty to institute reasonable security measures;

    f.    Whether TMX's failure to implement reasonable data security measures allowed the breach of its data systems to occur and caused the theft of Plaintiff's and the Class's data;

    g.    Whether reasonable security measures known and recommended by the data security community could have prevented the Data Breach;

    h.    Whether Plaintiff and the Class were injured and suffered damages or other losses because of TMX's  failure to reasonably protect its data systems; and

    i.    Whether Plaintiff and the Class are entitled to relief.

61.    **Typicality**.  Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is a typical member of the Class.  Plaintiff and the Class members are each persons received a loan from TMX; whose data resided on TMX's servers; and, whose PII was exposed in the Data Breach.  Plaintiff's injuries are similar to other Class members and Plaintiff seeks relief consistent with the relief due to the Class.

62.    **Adequacy**.  Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against TMX to obtain relief for himself and for the Class.  Plaintiff has no conflicts of interest with the Class.  Plaintiff also has retained counsel competent and experienced in complex class action litigation of this type, having previously litigated numerous data breach cases on behalf of consumers and financial institutions.  Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

63.    **Superiority**.  Consistent with Fed. R. Civ. P 23(b)(3), class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy. Individual litigation by each Class member would strain the court system because of the numerous members of the Class. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. A class action would also permit customers to recover even if their damages are small as compared to the burden and expense of litigation, a quintessential purpose of the class action mechanism.

64.    **Injunctive and Declaratory Relief**.  Consistent with Fed. R. Civ. P. 23(b)(2), TMX, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

## LEGAL CLAIMS

### COUNT I
### Negligence
### (On behalf of the Nationwide Class)

65.    Plaintiff repeats and re-alleges the allegations contained in  paragraphs 1-64 as if fully set forth herein.

66.    TMX owed a duty to Plaintiff and the members of the Class to take reasonable care in managing and protecting the sensitive data it obtained and solicited from Plaintiff and the Class, managed and stored.  This duty arises from multiple sources.

67.    TMX owed a common law duty to Plaintiff and the Class to implement reasonable data security measures because it was foreseeable that hackers would target TMX's data systems and servers containing Plaintiff's and the Class's sensitive data and that, should a breach occur, Plaintiff and the Class would be harmed.  TMX alone controlled its technology, infrastructure, digital platforms, and cybersecurity that were exposed during the Data Breach and allowed hackers to breach and steal TMX's customers' sensitive information.  It further knew or should have known that if hackers breached its data systems, they would extract sensitive data and inflict injury upon Plaintiff and the Class.  TMX knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen, and that individual need would continue long after the Data Breach ended.  Therefore, the Data Breach, and the harm it

caused Plaintiff and the Class, was the foreseeable consequence of TMX's unsecured, unreasonable data security measures.

68.    TMX, furthermore, assumed a duty to protect user data by obtaining and soliciting sensitive user data, collecting that data, and storing that data in its own databases.  TMX required that its customers provide highly sensitive PII, the very type of information that cybercriminals target.  TMX voluntarily stored that information on its servers and networks.  TMX was the only entity capable of implementing reasonable measures to protect user data and Plaintiffs and the Class relied on it to do so.  Thus, TMX voluntarily assumed a duty to protect Plaintiff and the Class's PII.

69.    Additionally, Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, required TMX to take reasonable measures to protect Plaintiff's and the Class's sensitive data and is a further source of TMX's duty to Plaintiff and the Class.  Section 5 prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like TMX of failing to implement and use reasonable measures to protect sensitive data.  TMX, therefore, was required and obligated to take reasonable measures to protect data it possessed, held, or otherwise used.  The FTC publications and data security breach orders described herein further form the basis of TMX's duty to adequately protect sensitive information.  By failing to implement and use reasonable data security measures, TMX acted in violation of § 5 of the FTCA.

70.    TMX is obligated to perform its business operations in accordance with industry standards.  Industry standards are another source of duty and obligations requiring TMX to exercise reasonable care with respect to Plaintiff and the Class by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and the Class.  Industry

best practices put the onus of adequate cybersecurity on the entity most capable of preventing a Data Breach. In this case, TMX was the only entity of adequately protecting the data that it obtained, solicited, collected, and stored. TMX, however, did not implement reasonable data security measures to prevent a Data Breach or to quickly identify and resolve a Data Breach. Consequently, it experienced a Data Breach lasting over two months that afforded hackers access to millions of customers' sensitive information.

71.     TMX breached its duty to Plaintiff and the Class by implementing unreasonable data security measures that it knew or should have known could cause a Data Breach. TMX knew or should have known that hackers might target sensitive data that TMX solicited and collected on its users and, therefore, needed to use reasonable data security measures to protect against a Data Breach. Indeed, TMX acknowledged that it needed to protect customers' sensitive data and represented that it would take the steps necessary to do so.

72.     TMX was fully capable of preventing the Data Breach. TMX knew or should have known of data security measures required or recommended by the FTC, state laws and guidelines, and other data security experts which, if implemented and used, would have prevented the Data Breach from occurring at all, or limited and shortened the scope of the Data Breach. TMX thus failed to take reasonable measures to secure its system, leaving it vulnerable to a breach.

73.     As a direct and proximate result of TMX's negligence, Plaintiff and the Class have suffered and will continue to suffer injury, including the ongoing risk that their data will be used nefariously against them or for fraudulent purposes.

## COUNT II
## Negligence *Per Se*
## (On behalf of the Nationwide Class)

74.    Plaintiff repeats and re-alleges the allegations contained paragraphs 1-64 as if fully set forth herein.

75.    TMX's unreasonable data security measures and failure to timely notify Plaintiff and the Class of the Data Breach violates Section 5 of the FTC Act.   Although the FTC Act does not create a private right of action, both require businesses to institute reasonable data security measures and breach notification procedures, which TMX failed to do.

76.    Section 5 of the FTCA, 15 U.S.C. §45, prohibits "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like TMX of failing to implement and use reasonable measures to protect users' sensitive data.   The FTC publications and orders described above also form the basis of TMX's duty.

77.    TMX violated Section 5 of the FTC Act by failing to use reasonable measures to protect users' personally identifying information and sensitive data and by not complying with applicable industry standards.   TMX's conduct was particularly unreasonable given the sensitive nature and amount of data it stored on its users and the foreseeable consequences of a Data Breach should TMX fail to secure its systems.

78.    TMX's violation of Section 5 of the FTC Act constitutes negligence per se.

79.    Additionally, TMX's implementation of inadequate data security measures, its failure to resolve known vulnerabilities and deficiencies, and its abdication of its responsibility to reasonably protect data it required users to provide and stored on its own servers and databases constitutes a violation the Restatement of the Law of Torts (Second).

80.     Plaintiff and the Class are within the class of persons Section 5 of the FTCA (and similar state statutes) and the Restatement of the Law of Torts (Second), was intended to protect. Additionally, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) and the Restatement of the Law of Torts (Second) were intended to guard against. The FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same type of harm suffered by Plaintiff and the Class.

81.     As a direct and proximate result of TMX's negligence per se, Plaintiff and the Class have suffered and continue to suffer injury.

### COUNT III
### Declaratory and Injunctive Relief
### (On behalf of the Nationwide Class)

82.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-64 as if fully set forth herein.

83.     Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

84.     An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendant's common law and other duties to act reasonably with respect to safeguarding the data of Plaintiff and the Class. Plaintiff alleges TMX's actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable.

Additionally, Plaintiff and the Class continue to suffer injury due to the continued and ongoing threat of additional fraud against them or on their accounts.

85.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.     TMX owed, and continues to owe a legal duty to secure the sensitive information with which it is entrusted, specifically including information it obtains from its customers, and to notify impacted individuals of the Data Breach under the common law, Section 5 of the FTC Act;

b.     TMX breached, and continues to breach, its legal duty by failing to employ reasonable measures to secure its customers' personal information; and,

c.     TMX's breach of its legal duty continues to cause harm to Plaintiff and the Class.

86.     The Court should also issue corresponding injunctive relief requiring TMX to employ adequate security protocols consistent with industry standards to protect its users' (*i.e.* Plaintiff's and the Class's) data.

87.     If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of TMX's data systems. If another breach of TMX's data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by

Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

88.    The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to TMX if an injunction is issued.

89.    Issuance of the requested injunction will not disserve the public interest.  To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

**PRAYER FOR RELIEF**

90.    Wherefore, Plaintiff, on behalf of themselves and the Class, requests that this Court award relief as follows:

a.    An order certifying the class and designating Plaintiff as the Class Representative and his counsel as Class Counsel;

b.    An award to Plaintiff and the proposed Class members of damages with pre-judgment and post-judgment interest;

c.    A declaratory judgment in favor of Plaintiff and the Class;

d.    Injunctive relief to Plaintiff and the Class;

e.    Award reasonable attorneys' fees and costs in accordance with O.C.G.A. § 13-6-11 and as permitted by law; and

f.    An award  such other and further relief as the Court may deem necessary or appropriate.

**DEMAND FOR JURY TRIAL**

91.    Plaintiff hereby demands a trial by jury of all issues so triable.

Date: April 6, 2023.                    Respectfully Submitted,


                                        */s/ Amy C. Daugherty*
                                        Amy C. Daugherty
                                        Georgia Bar No. 429299
                                        MaryBeth V. Gibson*
                                        Georgia Bar No. 725843
                                        N. Nickolas Jackson*
                                        Georgia Bar No. 841433
                                        **THE FINLEY FIRM, P.C.**
                                        3535 Piedmont Road
                                        Building 14, Suite 230
                                        Atlanta, GA 30305
                                        Telephone: (404) 320-9979
                                        Facsimile: (404) 320-9978
                                        adaugherty@thefinleyfirm.com
                                        mgibson@thefinleyfirm.com
                                        njackson@thefinleyfirm.com

                                        Brian C. Gudmundson*
                                        Michael J. Laird*
                                        Rachel K. Tack*
                                        **ZIMMERMAN REED LLP**
                                        1100 IDS Center
                                        80 South 8th Street
                                        Minneapolis, MN 55402
                                        Telephone: (612) 341-0400
                                        Facsimile: (612) 341-0844
                                        brian.gudmundson@zimmreed.com
                                        michael.laird@zimmreed.com
                                        rachel.tack@zimmreed.com

                                        Christopher D. Jennings*
                                        Tyler B. Ewigleben*
                                        **THE JOHNSON FIRM**
                                        610 President Clinton Ave., Suite 300
                                        Little Rock, AR 72201
                                        Telephone: (501) 372-1300
                                        chris@yourattorney.com
                                        tyler@yourattorney.com

                                        * To be admitted *pro hac vice*

                                        *Counsel for Plaintiff and the Proposed Class*

25

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Patsie Eslinger, individually and on behalf of all others similarly situated

## DEFENDANTS

TMX FINANCE CORPORATE SERVICES, INC. and TMX FINANCE LLC d/b/a "TITLEMAX," "TITLEBUCKS," and " INSTALOAN,"

**(b)** County of Residence of First Listed Plaintiff  Georgia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Chatham
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Amy C. Daugherty & MaryBeth V. Gibson THE FINLEY FIRM, P.C. 3535 Piedmont Road Building 14, Suite 230 Atlanta, GA 30305 T: (404) 320-9979

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question *(U.S. Government Not a Party)*
☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 367 Health Care/ Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☒ 360 Other Personal | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Sec. 1332(d)(2)(A)
Brief description of cause:
This is a class action for data breach due to the Defendants' failure to safeguard Plaintiff's private information

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $  $100,000,000
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE                          DOCKET NUMBER

DATE  4.6.2023
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #        AMOUNT        APPLYING IFP        JUDGE        MAG. JUDGE