**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

REY EIMERT, individually and on behalf of all
others similarly situated,

          Plaintiff,

v.

TMX FINANCE CORPORATE SERVICES,
INC. and TMX FINANCE LLC d/b/a
"TitleMax," "TitleBucks," and "InstaLoan",

          Defendants.

Case No.:  **CV 423-097**

**JURY TRIAL DEMANDED**
**COMPLAINT-CLASS ACTION**

## CLASS ACTION COMPLAINT

Plaintiff Rey Eimert ("Plaintiff"), by and through the undersigned counsel, brings this class action complaint against Defendant TMX Finance Corporate Services, Inc., and TMX Finance LLC d/b/a "TitleMax," "TitleBucks," and "InstaLoan" ("TMX" or "Defendant") on behalf of himself and all others similarly situated. Plaintiff makes the following allegations based upon personal knowledge as to his own actions and upon information and belief as to all other matters.

## NATURE OF THE CASE

1.     Plaintiff brings this class action against TMX for its failure to secure and safeguard customers' personally identifiable information ("PII")[1] and for failing to provide timely, accurate, and adequate notice to Plaintiff and Class Members that their PII had been compromised.

2.     TMX is a Georgia-based consumer credit products company that purports to provide credit to "underserved" consumers who "have nowhere else to turn."[2]

---

[1] PII is information that is used to confirm an individual's identity, and in this instance includes at least an individual's name, address, email address, phone number, and Social Security number.
[2] https://www.tmxfinancefamily.com/what-we-do/ (last visited April 11, 2023).

3. On March 30, 2023, TMX, began notifying state attorneys general and customers that it had sustained a massive data breach in which a hacker gained unauthorized access to its networks between at least December 2022 and February 13, 2023 (the "Data Breach").[3]

4. TMX admits the hacker accessed and may have exfiltrated highly-sensitive information stored on TMX's servers, including customer name, date of birth, passport number, driver's license number, federal/state identification card number, tax identification number, social security number and/or financial account information, and other information such as phone number, address, and email address.

5. TMX admits that the Data Breach has compromised the PII of over 4.8 million customers.

6. Despite having their system breached in early December 2022, TMX did not discover the breach until February 13, 2023, nearly two weeks after the suspected exfiltration that began on February 3, 2023.

7. TMX discovered the breach on February 13, 2023, however, they failed to inform the public of the Data Breach until over a month later.

8. The Data Breach occurred because TMX negligently failed to implement reasonable security procedures and practices, failed to disclose material facts surrounding its deficient data security protocols, and failed to timely notify the victims of the Data Breach.

9. As a result of TMX's failure to protect the sensitive information it was entrusted to safeguard, Plaintiff has already spent time responding to the breach and working to protect his identity from criminal fraudsters, and Plaintiff and Class Members also now face a significant

---

[3] Of note, although TMX believes the data breach to be contained, TMX has not confirmed that the incident actually is contained or that the data breach has ended.

present and ongoing risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

## PARTIES

10.     Defendant TMX Finance Corporate Services, Inc., is a Delaware corporation registered with the state of Georgia as a Foreign Profit Corporation with its principal place of business at 15 Bull Street, Suite 200, Savannah, Georgia 31401.

11.     Defendant TMX Finance LLC, is a Delaware Corporation with its principal place of business at 15 Bull Street, Suite 200, Savannah, Georgia 31401. TMX Finance LLC is the parent of TMX Finance Corporate Services, Inc.

12.     Plaintiff Rey Eimert is a resident and citizen of San Antonio, Texas, and a current TMX customer. On or about April 3, 2023, Mr. Eimert was notified via letter from TMX dated March 30, 2023, that he is a victim of the Data Breach.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000, there are more than 100 proposed Class Members, and minimal diversity exists because TMX and at least one Class Member are citizens of different States. This Court also has supplemental jurisdiction over the claims in this case pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy under Article III of the United States Constitution.

14.     The Court has personal jurisdiction over TMX because TMX is headquartered in Savannah, Georgia and is thus essentially at home there. TMX also conducts substantial business

in Georgia related to Plaintiff and Class Members and has thereby established minimum contacts

with Georgia sufficient to authorize this Court's exercise of jurisdiction over TMX.

15.    Venue in the Southern District of Georgia is proper under 28 U.S.C. § 1391 because

TMX resides in this District, a substantial part of the conduct giving rise to Plaintiff's claims

occurred in this District, including Defendant collecting and/or storing the PII of Plaintiff and

Class Members.

## FACTUAL ALLEGATIONS

### *TMX's Privacy Practices*

16.    TMX is a consumer credit products company that "provides credit to consumers

who are underserved by traditional lenders."[4]

17.    TMX is comprised of three different lending brands: TitleMax, TitleBucks, and

Instaloan.[5]

18.    TMX recognizes the importance of data security and uses its customers' concerns

over data security to market its services. TitleMax, one of TMX's lending brands expressly

represents on its website that "TitleMax … goes to extreme measures to keep our customers'

personal information safe. Your information is as safe as it can be with TitleMax."[6] TMX has

made this representation since at least February 6, 2015.[7]

19.    In the course of providing services, TMX collects customers' highly sensitive PII,

including Social Security numbers. As a result, these customers' highly sensitive PII is stored on

TMX's under secured internet-accessible network.

---

[4] https://www.tmxfinancefamily.com/what-we-do/ (last visited April 11, 2023).
[5] *Id.*
[6] https://www.titlemax.com/faqs/ (last visited April 11, 2023).
[7] https://web.archive.org/web/20150206045803/https://www.titlemax.com/faqs/ (last visited April 11, 2023).

20.     Plaintiff and Class Members relied on TMX to keep their information confidential and secure.

21.     By obtaining, collecting, and storing the PII of Plaintiff and Class Members, TMX assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII from unauthorized disclosure.

22.     TMX maintains a privacy policy dated January 2020, that is accessible from its website ("Privacy Policy"). TMX's Privacy Policy states that "we use security measures that comply with federal law. These measures include computer and mobile application safeguards and secured files and buildings. We also maintain physical, electronic and procedural safeguards (i.e., computer virus protection software, firewalls, encryption). Only authorized employees have access." TMX failed to comply with its privacy policy, thereby exposing millions of its customers' most sensitive personal information in the Data Breach.

### The Data Breach

23.     Between at least December 2022 and February 13, 2023, a hacker infiltrated TMX's network and accessed a plethora of highly sensitive PII stored on its servers, including full names and Social Security numbers for 4.8 million current or former borrowers.

24.     TMX did not disclose the existence of the Data Breach until over a month after its discovery on February 13, 2023, when it began notifying state attorneys general and affected borrowers on March 30, 2023.

25.     In its notice to state attorneys general, TMX stated:

   a.     It discovered the breach on March 1, 2023;

   b.     The breach occurred on December 10, 2022;

   c.     4,822,580 people were affected;

      d.     TMX described the breach as "External system breach (hacking)"; and

      e.     The hackers acquired Name or Other PII and Social Security numbers.[8]

26.     TMX's sample form notification letter provides the following description:

> On February 13, 2023, we detected suspicious activity on our systems and promptly took steps to investigate the incident. As part of that investigation, global forensic cybersecurity experts were retained. Based on the investigation to date, the earliest known breach of TMC's systems started in early December 2022. On March 1, 2023, the investigation confirmed that information may have been acquired between February 3, 2023 – February 14, 2023. We promptly began a review of potentially affected files to determine what information may have been involved in this incident. We notified the FBI but have not delayed this notification for any law enforcement investigation…. The personal information involved may have included your name, date of birth, passport number, driver's license number, federal/state identification card number, tax identification number, social security number and/or financial account information, and other information such as phone number, address, and email address…. Our investigation is still in progress, but TMX believes the incident has been contained. We continue to monitor our systems for any suspicious activity. We have implemented additional security features, such as additional endpoint protection and monitoring, as well as resetting all employee passwords.[9]

27.     From TMX's notice it is unclear: exactly when information was taken; when TMX "took steps to investigate the incident"; the total extent of what data was exposed; when TMX took action to stop the breach; and whether the breach has actually been stopped. The notice is also inconsistent with TMX's notice to state attorney generals where it claimed it discovered the breach on March 1, 2023.

28.     The only meaningful information TMX's notice provides is that all or nearly all of the information provided by customers was breached.

---

[8]      https://apps.web.maine.gov/online/aeviewer/ME/40/179ab0ce-2c43-4119-ae5a-db766d4be3e0.shtml (last visited April 10, 2023).

[9]      https://apps.web.maine.gov/online/aeviewer/ME/40/179ab0ce-2c43-4119-ae5a-db766d4be3e0/10c498f9-1367-4030-bacc-e5698f177f13/document.html (last downloaded April 10, 2023).

29.     TMX's notice downplays the incident saying that "information may have been acquired" and that "[t]he personal information involved may have included …" rather than providing definite statements.

30.     This notice is in conflict with TMX's notice to the state attorney generals. There, TMX admitted that information was acquired including "Name or other personal identifier in combination with: Social Security Number."[10]

31.     TMX's notice also discusses actions TMX claims to have taken in response to the data breach, stating, "[w]e have implemented additional security features, such as additional endpoint protection and monitoring, as well as resetting all employee passwords. We continue to evaluate ways to further enhance the security of our systems."[11]

32.     Absent from the notice are any details of how the breach happened or how TMX's actions have remediated the root cause.

33.     TMX has posted a "Cyber Security Alert" on their website.[12] It is unclear when this alert was posted.[13]

34.     In this Cyber Security Alert, TMX admits that "certain individually identified information was exfiltrated by an unauthorized actor."[14]

---

[10]                https://apps.web.maine.gov/online/aeviewer/ME/40/179ab0ce-2c43-4119-ae5a-db766d4be3e0.shtml (last visited April 10, 2023).
[11] https://apps.web.maine.gov/online/aeviewer/ME/40/179ab0ce-2c43-4119-ae5a-db766d4be3e0/10c498f9-1367-4030-bacc-e5698f177f13/document.html (last visited April 10, 2023).
[12] https://www.titlemax.com (last visited April 11, 2023).
[13] The available metadata for the "Cyber Security Alert 2023" pdf indicates it was created April 10, 2023.
[14]   https://www.tmxdisclosures.com/storage/media/7c667df0-e15c-4499-b268-402ccb2bc0bc.pdf (last visited April 11, 2023).

35. TMX provides no explanation for why it delayed notifying customers about the Data Breach for almost a month after it detected the Data Breach or why it took TMX almost two months to discover the Data Breach. The PII of Plaintiff and Class Members could have been in the hands of hackers for as long as almost three months before TMX attempted to notify affected consumers. By waiting this long to disclose the Data Breach and by downplaying the risk that victims' PII would be misused by bad actors, TMX prevented victims from taking meaningful, proactive, and targeted mitigation measures to protect themselves from harm.

### *The Data Breach was Preventable*

36. In response to the Data Breach, TMX stated it "promptly took steps to investigate the incident" as soon as it discovered the Data Breach.[15]

37. But TMX, like any company of its size that stores massive amounts of sensitive personal data, should have had robust protections in place to detect and terminate a successful intrusion long before access and exfiltration could expand to millions of customer files. TMX's implementation of enhanced security measures only after the fact is inexcusable given its knowledge that it was a prime target for cyberattacks.

38. Its status as a prime target for cyberattacks was known and obvious to TMX as it observed frequent public announcements of data breaches affecting various service providers and understood that the type of information TMX collects, maintains, and stores is highly coveted and a frequent target of hackers. Over 1,800 data breaches occurred in 2022.[16]

---

[15]    https://apps.web.maine.gov/online/aeviewer/ME/40/179ab0ce-2c43-4119-ae5a-db766d4be3e0/10c498f9-1367-4030-bacc-e5698f177f13/document.html (last visited April 10, 2023).
[16]    https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited April 10, 2023).

39.    Data breaches and the harm they cause have become so common and notorious the Federal Trade Commission ("FTC") has issued guidance for how to address the destruction caused by an unauthorized person having access to someone's PII: "Once identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[17]

40.    At all relevant times, TMX knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences that would occur if its data security system was breached, including, specifically, the significant costs that would be imposed on its individual customers as a result of a breach.

41.    TMX was, or should have been, fully aware of the significant number of customers whose PII it collected, and thus, the significant number of customers who would be harmed by a breach of its systems.

42.    But despite all of the publicly available knowledge of the continued compromises of PII and despite holding the PII of millions of customers, TMX failed to use reasonable care in maintaining the privacy and security of the PII of Plaintiff and Class Members. Had TMX implemented common sense security measures, hackers never could have accessed millions of customer files and the Data Breach would have been prevented or much smaller in scope.

### *Allegations Relating to Plaintiff Rey Eimert*

43.    In approximately July 2022, Plaintiff became a customer of TMX. In the course of becoming a customer, Plaintiff had to provide TMX highly sensitive personal information, including, among other things, his Social Security number.

---

[17]    https://dss.mo.gov/cd/older-youth-program/files/taking-charge-what-to-do-if-identity-is-stolen.pdf (last accessed April 10, 2023).

44.     On or about April 3, 2023, Plaintiff received a notification letter from TMX stating that he was a victim of the Data Breach.

45.     The letter recommended that Plaintiff take certain actions like monitoring his accounts and "remain vigilant against potential identity theft and fraud by carefully reviewing credit reports and account statements to ensure that all activity is valid."

46.     Despite making these recommendations, TMX itself was not vigilant against the risks of a data breach.

47.     To protect himself from additional harm, Plaintiff has been and will continue to be forced to spend significant time and effort engaging in remedial efforts to protect his information from additional attacks. Plaintiff must now continue to spend time and effort reviewing his financial and other account statements for evidence of unauthorized activity, which he will continue to do indefinitely. Plaintiff suffered significant distress knowing his highly personal information is no longer confidential and his accounts are being targeted. Given the nature of the information exposed in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff faces a significant present and ongoing risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

48.     Upon information and belief, TMX continues to store and/or share Plaintiff PII on its internal systems. Thus, Plaintiff has a continuing interest in ensuring that his PII is protected and safeguarded from future breaches.

### TMX Failed to Comply with Federal Law and Regulatory Guidance

49.     Federal agencies have issued recommendations and guidelines to help minimize the risks of a data breach for businesses holding sensitive data. For example, the Federal Trade Commission (FTC) has issued numerous guides for business highlighting the importance of

reasonable data security practices, which should be factored into all business-related decision making.[18]

50.     The FTC's publication Protecting Personal Information: A Guide for Business sets forth fundamental data security principles and practices for businesses to implement and follow as a means to protect sensitive data.[19] Among other things, the guidelines note that businesses should (a) protect the personal customer information that they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems. The FTC guidelines further recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.[20]

51.     Additionally, the FTC recommends that organizations limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security; monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[21] This is consistent with guidance provided by the FBI.

52.     The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders

---

[18] https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited April 11, 2023).
[19] Id.
[20] Id.
[21] Id.

resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[22]

53.    TMX was fully aware of its obligation to implement and use reasonable measures to protect the PII of its customers but failed to comply with these basic recommendations and guidelines that would have prevented this breach from occurring. TMX's failure to employ reasonable measures to protect against unauthorized access to patient information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

54.    Defendant also failed to meet the minimum standards of the National Institute of Standards and Technology ("NIST") Cybersecurity Framework Version 1.1[23] (including without limitation) PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2).

### *The Impact of the Data Breach on Victims*

55.    TMX's failure to keep Plaintiff's and Class Members' PII secure has severe ramifications. Given the sensitive nature of the PII stolen in the Data Breach—names, financial account information, date of birth, driver's license number, and Social Security numbers—hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury including identity theft and related cybercrimes due to the Data Breach.

---

[22]https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited April 10, 2023).
[23]  https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.04162018.pdf (last accessed April 10, 2023)

56.    The PII exposed in the Data Breach is highly coveted and valuable on underground markets as it can be used to commit identity theft and fraud. Malicious actors use PII to, among other things, gain access to consumers' bank accounts, social media, and credit cards. Malicious actors can also use consumers' PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government IDs, or create "synthetic identities." [24]

57.    Further, malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also re-use stolen PII, meaning individuals can be the victims of several cybercrimes stemming from a single data breach.

58.    Victims of the Data Breach face significant harms as the result of the Data Breach, including, but not limited to, identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and healthcare statements, checking credit reports, and spending time and effort searching for and responding to unauthorized activity.

59.    It is no wonder then that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;

- 76% felt violated;

- 32% experienced financial related identity problems;

- 83% reported being turned down for credit or loans;

---

[24] A criminal combines real and fake information to create a new "synthetic" identity, which is used to commit fraud.

- 32% report problems with family members as a result of the breach;

- 10% reported feeling suicidal.[25]

60.     Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48.3% of respondents reported sleep disturbances;

- 37.1% reported an inability to concentrate/lack of focus;

- 28.7% reported they were unable to go to work because of physical symptoms;

- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[26]

61.     The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.[27]

62.     Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each

---

[25] https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf (last visited April 10, 2023).

[26] https://www.idtheftcenter.org/wp-content/uploads/images/page-docs/Aftermath_2017.pdf (last visited April 10, 2023).

[27] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge— the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

63.    As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

    a.    the unconsented disclosure of confidential information to a third party;

    b.    losing the inherent value of their PII;

    c.    losing the value of access to their PII permitted by TMX;

    d.    losing the value of the explicit and implicit promises of data security;

    e.    identity theft and fraud resulting from the theft of their PII;

    f.    costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

    g.    anxiety, emotional distress, and loss of privacy;

    h.    the present value of ongoing credit monitoring and identity theft protection services necessitated by TMX's Data Breach;

    i.    unauthorized charges and loss of use of and access to their accounts;

    j.    lowered credit scores resulting from credit inquiries following fraudulent activities;

    k.    costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

    l.    the continued, imminent, and certainly impending injury flowing from potential fraud and identify theft posed by their PII being in the possession of one or many unauthorized third parties.

64.    Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement.

65.    There may also be a significant time lag between when personal information is stolen and when it is misused for fraudulent purposes. According to the Government Accountability Office, which conducted a study regarding data breaches: "law enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[28]

66.    Plaintiff and Class Members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more to work with a provider that has better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[29]

67.    Likewise, the American Bankers Association, reporting on a global consumer survey regarding concerns about privacy and data security, noted that 29% of consumers would avoid using a company that had experienced a data breach, with 63% of consumers indicating they would avoid such a company for a period of time.[30]

68.    Plaintiff and Class Members have a direct interest in TMX's promises and duties to protect their PII, *i.e.*, that TMX *not increase* their risk of identity theft and fraud. Because TMX failed to live up to its promises and duties in this respect, Plaintiff and Class Members seek the

---

[28] http://www.gao.gov/new.items/d07737.pdf (last visited April 10, 2023).
[29]        https://web.archive.org/web/20220205174527/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html (last visited April 10, 2023).
[30] https://bankingjournal.aba.com/2019/09/what-compliance-needs-to-know-in-the-event-of-a-security-breach/ (last visited April 10, 2023).

present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by TMX's wrongful conduct. Through this remedy, Plaintiff seeks to restore himself and Class Members as close to the same position as they would have occupied but for TMX's wrongful conduct, namely its failure to adequately protect Plaintiff's and Class Members' PII.

69.    Plaintiff and Class Members further seek to recover the value of the unauthorized access to their PII permitted through TMX's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

70.    TMX's delayed notice letter also caused Plaintiff and Class Members harm. Furthermore, the letter did not explain the precise nature of the attack, the identity of the hackers, or the number of individuals affected. TMX's decision to withhold these key facts is significant

because affected individuals may take different precautions depending on the severity and imminence of the perceived risk. By waiting over a month to disclose the Data Breach and by downplaying the risk of misuse, TMX prevented victims from taking meaningful, proactive, and targeted mitigation measures to secure their PII and accounts.

71.    Plaintiff and Class Members have an interest in ensuring that their PII is secured and not subject to further theft because TMX continues to hold their PII.

## CLASS ACTION ALLEGATIONS

72.    Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff seeks certification of the following nationwide class (the "Nationwide Class" or the "Class"):

> **All individuals residing in the United States whose PII was compromised in the Data Breach.**

73.    The Class asserts claims against TMX for negligence (Count I), unjust enrichment (Count II), invasion of privacy (Count III), and violation of the Georgia Deceptive Practices Act (Count IV).

74.    Specifically excluded from the Nationwide Class are TMX and its officers, directors, or employees; any entity in which TMX has a controlling interest; and any affiliate, legal representative, heir, or assign of TMX. Also excluded from the Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

75.    **Jurisdictional Amount.** As alleged herein, Plaintiff seeks damages on behalf of himself and more than 4.8 million putative class members, satisfying the $5 million jurisdictional requirement of 28 U.S.C. § 1332(d)(2).

76.     **Ascertainablity.** The members of the Class are readily identifiable and ascertainable. TMX and/or its affiliates, among others, possess the information to identify and contact Class Members.

77.     **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that joinder of all of them is impracticable. TMX's statements reveal that the Class contains more than 4.8 million individuals whose PII was compromised in the Data Breach.

78.     **Typicality: Federal Rule of Civil Procedure 23(a)(3).** As to the Class and Subclass, Plaintiff's claims are typical of the claims of the members because all Class Members had their PII compromised in the Data Breach and were harmed as a result.

79.     **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no known interest antagonistic to those of the Class and their interests are aligned with Class Members' interests. Plaintiff was subject to the same Data Breach as Class Members, suffered similar harms, and faces similar threats due to the Data Breach. Plaintiff has also retained competent counsel with significant experience litigating complex class actions, including Data Breach cases.

80.     **Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** There are questions of law and fact common to the Class such that there is a well-defined community of interest in this litigation. These common questions predominate over any questions affecting only individual Class Members. The common questions of law and fact include, without limitation:

      a.    Whether TMX owes Plaintiff and Class Members a duty to implement and maintain reasonable security procedures and practices to protect their PII;

      b.    Whether TMX acted negligently in connection with the monitoring and/or protection of Plaintiff's and Class Members' PII;

    c.    Whether TMX violated its duty to implement reasonable security systems to protect Plaintiff's and Class Members' PII;

    d.    Whether TMX's breach of its duty to implement reasonable security systems directly and/or proximately caused damages to Plaintiff and Class Members;

    e.    Whether TMX provided timely notice of the Data Breach to Plaintiff and Class Members; and

    f.    Whether Plaintiff and Class Members are entitled to compensatory damages, punitive damages, and/or statutory or civil penalties as a result of the Data Breach.

81.    TMX has engaged in a common course of conduct and Plaintiff and Class Members have been similarly impacted by TMX's failure to maintain reasonable security procedures and practices to protect customer's PII, as well as TMX's failure to timely alert affected customers to the Data Breach.

82.    **Superiority: Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most if not all Class Members would find the cost of litigating their individual claims prohibitively high and have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members and risk inconsistent treatment of claims arising from the same set of facts and occurrences. Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under the applicable rules.

## CLAIMS FOR RELIEF

### COUNT I
**Negligence**
***(On Behalf of Plaintiff and the Class)***

83.    Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

84.     As a condition of obtaining a loan, Plaintiff and Class Members were required to provide TMX and/or its affiliates with their PII. TMX collected and stored this PII for purposes of providing services to its customers.

85.     TMX owed Plaintiff and Class Members a duty to exercise reasonable care in protecting their PII from unauthorized disclosure or access.

86.     TMX owed a duty of care to Plaintiff and Class Members to provide adequate data security, consistent with industry standards, to ensure that TMX's systems and networks adequately protected the PII.

87.     TMX's duty to use reasonable care in protecting PII arises as a result of the parties' relationship, as well as common law and federal law, and TMX's own policies and promises regarding privacy and data security.

88.     Section 5 of the Federal Trade Commission Act ("FTC Act") prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as TMX, of failing to use reasonable measures to protect PII. 15 U.S.C. § 45(a)(1).

89.     The FTC publications and orders described above also form part of the basis of TMX's duty in this regard.

90.     TMX violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and failing to comply with applicable industry standards. TMX's conduct was unreasonable given the nature and amount of PII they obtained, stored, and disseminated in the regular course of their business, and the foreseeable consequences of a data breach, including, specifically, the significant damage that would result to Plaintiff and Class Members.

91.      Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

92.      The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class Members.

93.      TMX's violations of Section 5 of the FTC Act therefore constitute negligence *per se*.

94.      TMX knew, or should have known, of the risks inherent in collecting and storing PII in a centralized location, TMX's vulnerability to network attacks, and the importance of adequate security.

95.      TMX breached its duty to Plaintiff and Class Members in numerous ways, as described herein, including by:

a.      Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the PII of Plaintiff and Class Members;

b.      Failing to comply with industry standard data security measures leading up to the Data Breach;

c.      Failing to comply with its own Privacy Policy;

d.      Failing to comply with regulations protecting the PII at issue during the period of the Data Breach;

e.      Failing to adequately monitor, evaluate, and ensure the security of TMX's network and systems;

f.      Failing to recognize in a timely manner that PII had been compromised; and

g.      Failing to timely and adequately disclose the Data Breach.

96.     Plaintiff's and Class Members' PII would not have been compromised but for TMX's wrongful and negligent breach of its duties.

97.     TMX's failure to take proper security measures to protect the sensitive PII of Plaintiff and Class Members created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access and exfiltration of PII by unauthorized third parties. Given that financial services providers are prime targets for hackers, Plaintiff and Class Members are part of a foreseeable, discernible group that was at high risk of having their PII misused or disclosed if not adequately protected by TMX.

98.     It was also foreseeable that TMX's failure to provide timely and forthright notice of the Data Breach would result in injury to Plaintiff and Class Members.

99.     As a direct and proximate result of TMX's conduct, Plaintiff and Class Members have and will suffer damages including: (i) the loss of rental or use value of their PII; (ii) the unconsented disclosure of their PII to unauthorized third parties; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PII, which remains in TMX's possession and is subject to further unauthorized disclosures so long as TMX fails to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the

rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by TMX's data breach; and (x) any nominal damages that may be awarded.

**COUNT II**
**Unjust Enrichment**
*(On Behalf of Plaintiff and the Class)*

100.    Plaintiff repeats and realleges every allegation set forth in paragraphs 1 through 82.

101.    Plaintiff and Class Members have an interest, both equitable and legal, in the PII about them that was conferred upon, collected by, used by, and maintained by TMX and that was ultimately stolen in the TMX data breach.

102.    TMX benefited by the conferral upon it of the PII pertaining to Plaintiff and the Class Members and by its ability to retain, use, sell, and profit from that information. TMX understood and valued this benefit.

103.    TMX also understood and appreciated that the PII pertaining to Plaintiff and Class Members was private and confidential and its value depended upon TMX maintaining the privacy and confidentiality of that PII.

104.    Without TMX's willingness and commitment to maintain the privacy and confidentiality of the PII, that PII would not have been transferred to and entrusted to TMX.

105.    TMX admits that it uses the PII it collects for, among other things: "[f]or our marketing purposes – to offer our products and services to you;" "[f]or joint marketing with other financial companies;" "[f]or our affiliates to market to you;" and "[f]or non-affiliates to market to you."[31] This use of the customer's PII continues even after Plaintiff or Class Members are no

---

[31] https://www.tmxdisclosures.com/titlemax/privacy-policy (last visited April 11, 2023).

longer TMX customers, "[w]hen you are no longer our customer, we continue to share your information…"[32]

106.    Because of TMX's use of Plaintiff's and Class Members' PII, TMX sold more services and products than it otherwise would have. TMX was unjustly enriched by profiting from the additional services and products it was able to market, sell, and create to the detriment of Plaintiff and Class Members.

107.    TMX also benefitted through its unjust conduct by retaining money that it should have used to provide reasonable and adequate data security to protect Plaintiff's and Class Members' PII.

108.    TMX also benefitted through its unjust conduct in the form of the profits it gained through the use of Plaintiff's and Class Members' PII.

109.    It is inequitable for TMX to retain these benefits.

110.    As a result of TMX's wrongful conduct as alleged in this Complaint (including among other things its failure to employ adequate data security measures, its continued maintenance and use of the PII belonging to Plaintiff and Class Members without having adequate data security measures, and its other conduct facilitating the theft of that PII), TMX has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class Members.

111.    TMX's unjust enrichment is traceable to and resulted directly and proximately from the conduct alleged herein, including the compiling and use of Plaintiff's and Class Members' sensitive PII, while at the same time failing to maintain that information secure from intrusion and theft by hackers and identity thieves.

---

[32] *Id.*

112.    It is inequitable, unfair, and unjust for TMX to retain these wrongfully obtained benefits. TMX's retention of wrongfully obtained monies violates fundamental principles of justice, equity, and good conscience.

113.    The benefit conferred upon, received, and enjoyed by TMX was not conferred gratuitously, and it would be inequitable, unfair, and unjust for TMX to retain the benefit.

114.    TMX's defective security and its unfair and deceptive conduct have, among other things, caused Plaintiff and Class Members to unfairly incur substantial time and/or costs to mitigate and monitor the use of their PII and has caused the Plaintiff and Class Members other damages as described herein.

115.    Plaintiff and Class Members have no adequate remedy at law.

116.    TMX is therefore liable to Plaintiff and Class Members for restitution or disgorgement in the amount of the benefit conferred on TMX as a result of its wrongful conduct, including specifically: the value to TMX of the PII that was stolen in the Data Breach; the profits TMX received and is receiving form the use of that information; the amounts that TMX overcharged Plaintiff and Class Members for use of TMX's products and services; and the amounts that TMX should have spent to provide reasonable and adequate data security to protect Plaintiff's and Class Members' PII.

## COUNT III
### Invasion of Privacy
### *(On Behalf of Plaintiff and the Class)*

117.    Plaintiff repeats and realleges every allegation set forth in paragraphs 1 through 82.

118.    Plaintiff and Class Members shared PII with TMX and/or its affiliates that Plaintiff and Class Members wanted to remain private and non-public.

119.    Plaintiff and Class Members reasonably expected that the PII they shared with TMX would be protected and secured against access by unauthorized parties and would not be disclosed to or obtained by unauthorized parties, or disclosed or obtained for any improper purpose.

120.    TMX intentionally intruded into Plaintiff's and Class Members' seclusion by disclosing without permission their PII to a third party who then sold their PII to other third-parties on the dark web.

121.    By failing to keep Plaintiff's and Class Members' PII secure, and disclosing PII to unauthorized parties for unauthorized use, TMX unlawfully invaded Plaintiff's and Class Members' privacy right to seclusion by, inter alia:

122.    Intruding into their private affairs in a manner that would be highly offensive to a reasonable person;

123.    Invading their privacy by improperly using their PII properly obtained for another purpose, or disclosing it to unauthorized persons;

124.    Failing to adequately secure their PII from disclosure to unauthorized persons; and

125.    Enabling the disclosures of their PII without consent.

126.    The PII that was compromised during the Data Breach was highly sensitive, private, and confidential, as it included Social Security numbers and other information that is the type of sensitive, personal information that one normally expects will be protected from exposure by the entity charged with safeguarding it.

127.    TMX's intrusions into Plaintiff's and Class Members' seclusion were substantial and would be highly offensive to a reasonable person, constituting an egregious breach of social norms.

128.    As a direct and proximate result of TMX's invasion of privacy, Plaintiff and Class Members suffered injury and sustained actual losses and damages as alleged herein. Plaintiff and Class Members alternatively seek an award of nominal damages.

## COUNT IV
## VIOLATIONS OF THE GEORGIA DECEPTIVE PRACTICES ACT
## GA. CODE ANN. §§ 10-1-370, *ET SEQ.*
### *(On Behalf of Plaintiff and the Class)*

129.    Plaintiff repeats and realleges every allegation set forth in paragraphs 1 through 82.

130.    Plaintiff, Defendant, and Class Members are within the definition of "persons" as defined in the Georgia Deceptive Trade Practices Act. Ga. Code Ann. § 10-1-371(5).

131.    A person violates the Georgia Deceptive Trade Practices Act when they:

(5) Represent that goods or services have characteristics … uses, [or] benefits that they do not have; (7) Represent that goods or services are of a particular standard, quality, or grade … if they are another; [or] (12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.
GCA §10-1-372 (a)(5), (7), (12).

132.    Defendant has violated the Georgia Deceptive Trade Practices Act by:

   a.    Hiding the fact that it did not employ reasonable measures to secure consumers' PII. Defendant could and should have disclosed its inadequate data security measures to its customers;

   b.    Representing either implicitly or impliedly that its data security practices were sufficient to protect consumers' PII. As a procurer of customers' PII, Defendant through implication represented to Plaintiff and Class members that its security practices were adequate to protect the PII.

133.    Plaintiff and the Class Members do not need to prove "actual confusion or misunderstanding" to prevail under the statute. GCA § 10-1-372(b).

134.    "A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable. Proof of monetary damage … or intent to deceive is not required." GCA §10-1-373(a).

The relief provided by this section "is in addition to remedies otherwise available against the same conduct under the common law or other statutes of this state." GCA §10-1-373(c).

135.    Defendant provided a deficient notice of the Data Breach. The notice fails to provide enough detail regarding the full scope of the Data Breach or sufficient details related to the remedial measures taken by Defendant. This deficient notice leaves Plaintiff and Class Members uninformed as to the adequacy of Defendant's data security and its ability to protect the PII. Additionally, Defendant has provided no method for Plaintiff or Class Members to request it destroy any unnecessary PII, further exposing Plaintiff and Class Members. Without this information and significant improvements, Plaintiff and Class Members remain at risk.

136.    This deficient notice continues to represent and imply that its data security measures are adequate to protect Plaintiff and Class Members' PII. This representation without a full disclosure of the facts surrounding the Data Breach and response places Plaintiff and Class Members at further risk.

137.    Plaintiff and the Class are entitled to the injunctive relief sought here. Defendant retains their PII, is still at foreseeable risk of future cyber attacks, has failed to disclose enough information to identify remedial measures that will protect the Class's PII.

138.    Defendant knew or should have known that its data security measures were inadequate, especially given the sensitive nature of the PII collected and stored. Despite this, Defendant willfully engaged in deceptive trade practices knowing them to be deceptive by representing the adequacy of their data security. Under the statute the Court is empowered to award attorney's fees to the prevailing party if "the party charged with a deceptive trade practice has willingly engaged in the trade practice knowing it to be deceptive." GCA §10-1-373(b)(2). The Court should grant Plaintiff and the Class Members' request for attorney fees.

139.    The statute further provides that "Costs shall be allowed to the prevailing party unless the court otherwise directs." GCA §10-1-373(b).

140.    As a result of Defendant's deceptive acts and practices, Plaintiff and the Class have suffered and will continue to suffer injury, ascertainable losses of money or property, and non-monetary damages, as alleged herein.

141.    Plaintiff and the Class seek all monetary and non-monetary relief allowed by the Georgia Deceptive Trade Practices Act, including injunctive relief and attorneys' fees.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class set forth herein, respectfully requests the following relief:

A.    That the Court certify this action as a class action and appoint Plaintiff and his Counsel to represent the Class;

B.    That the Court grant permanent injunctive relief to prohibit and prevent TMX from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.    That the Court award Plaintiff and Class Members compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

D.    That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by TMX as a result of their unlawful acts, omissions, and practices;

E.    That Plaintiff be granted the injunctive relief sought herein;

F.    That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

G.      That the Court award pre-and post-judgment interest at the maximum legal rate and

all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial in the instant action.

Dated: April 12, 2023.

*/s/ John R. Bevis*
John R. Bevis, Georgia Bar No. 056110
Roy E. Barnes,* Georgia Bar No. 03900

BARNES LAW GROUP, LLC
31 Atlanta Street
Marietta, GA 30060
Telephone:  770-227-7375
E-Mail: bevis@barneslawgroup.com
E-Mail: roy@barneslawgroup.com


*/s/ Barrett J. Vahle*
*Lead Counsel for Plaintiff Rey Eimert*
Norman E. Siegel,* Missouri Bar No. #44378
Barrett J. Vahle,* Missouri Bar No. #56674
Tanner J. Edwards,* Missouri Bar No #68039
Brandi S. Spates,* Missouri Bar No #72144

STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
E-Mail: siegel@stuevesiegel.com
E-Mail: vahle@stuevesiegel.com
E-Mail: tanner@stuevesiegel.com
E-Mail: spates@stuevesiegel.com

*Counsel for Plaintiff*

*\*Pro Hac Vice Forthcoming*

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
REY EIMERT, Individually and on behalf of all others similarly situated

**(b)** County of Residence of First Listed Plaintiff   San Antonio, Texas
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See Attachment.

## DEFENDANTS
TMX FINANCE CORPORATE SERVICES, INC. and TMX FINANCE LLC d/b/a "TitleMax," "TitleBucks," and "InstaLoan"

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*   Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & / ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / Personal Injury | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability / Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| Student Loans (Excludes Veterans) | ☐ 340 Marine / ☐ 368 Asbestos Personal Injury Product | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | ☐ 345 Marine Product Liability / Liability | | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle / **PERSONAL PROPERTY** | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle / ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | Product Liability / ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal / ☒ 380 Other Personal | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury / Property Damage | ☐ 751 Family and Medical | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - / ☐ 385 Property Damage | Leave Act | | ☐ 893 Environmental Matters |
| | Medical Malpractice / Product Liability | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2)

Brief description of cause:
Damages from data breach exceeding $5 Million, with > 100 putative class members, and minimal diversity

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
5,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE  Judge Stan Baker
DOCKET NUMBER  4:23-cv-00078

DATE
04/12/2023

SIGNATURE OF ATTORNEY OF RECORD
John R. Bevis

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

<u>**ATTACHMENT**</u>
**Attorneys for Plaintiff**

Barrett J. Vahle* - *Lead Counsel for Plaintiff Rey Eimert*
Norman E. Siegel*
Tanner J. Edwards*
Brandi S. Spates*
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
E-Mail: siegel@stuevesiegel.com
E-Mail: vahle@stuevesiegel.com
E-Mail: tanner@stuevesiegel.com
E-Mail: spates@stuevesiegel.com


John R. Bevis
Roy E. Barnes*
BARNES LAW GROUP, LLC
31 Atlanta Street
Marietta, GA 30060
Telephone:  770-227-7375
E-Mail: bevis@barneslawgroup.com
E-Mail: roy@barneslawgroup.com

*Pro Hac Vice Application Forthcoming