## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | |
|---|---|
| Dewayne Jackson, individually and on behalf of all others similarly situated, | Case No. 4:23-cv-099 |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| TMX Finance, LLC; and TMX Finance Corporate Services, Inc., | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Dewayne Jackson ("Plaintiff"), individually and on behalf of all other similarly situated individuals (the "Class Members," as defined below), by and through his counsel, files this Class Action Complaint against TMX Finance, LLC and TMX Finance Corporate Services, Inc. (collectively "TMX" or "Defendants") and alleges the following based on personal knowledge of facts pertaining to himself and on information and belief based on the investigation of counsel as to all other matters.

## INTRODUCTION

1.       TMX Finance, LLC is the parent company of TMX Finance Corporate Services, Inc. TMX Finance, LLC, through its wholly owned subsidiary, TMX Finance Corporate Services, Inc., operates multiple consumer credit and lending businesses. Such businesses include TitleMax, Inc., InstaLoan, and TitleBucks.

2.      Defendants operate several consumer lending businesses that "provide access to credit for consumers who are underserved by traditional lenders."[1] Defendants' mission is to "provide financial products to people without access to traditional credit through…TitleMax, TitleBucks, and InstaLoan."[2]

3.      In carrying out their consumer credit businesses, Defendants obtain, collect, use, and derive a benefit from the Personal Identifying Information ("PII") of Plaintiff and Class Members. As such, Defendants assumed the legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

4.      This class action seeks to redress Defendants' unlawful, willful and wanton failure to reasonably protect the sensitive PII of the Plaintiff and Class Members (as defined below), in violation of Defendants' legal obligations.  Defendants failed to properly safeguard and protect the PII in its possession, thereby allowing cybercriminals the opportunity to steal Plaintiff's and Class Members' valuable PII from Defendants' inadequately cybersecurity.

5.      On March 30, 2023, Defendant TMX Finance Corporate Services, Inc. issued a notice letter ("Breach Notice") disclosing to its customers that it had experienced a cyberattack compromising the PII of approximately 4,822,580 individuals who have used Defendants' services in the past (the "Data Breach"). The PII compromised from the Data Breach includes, but is not limited to, names, dates of birth, passport numbers, driver's license numbers, federal/state identification card numbers, tax identification numbers, social security numbers and/or financial account information, and other information such as phone numbers, addresses, and email addresses.[3]

---

[1] *See* https://www.tmxfinancefamily.com/what-we-do/ (last visited April 11, 2023).
[2] *Id.*
[3] *See* **Exhibit 1**.

6.      The Breach Notice informed recipients of Defendants' services that "the earliest known breach of TMX's systems started in early December 2022."[4] Despite the first breach occurring in December of 2022, TMX did not realize it had suffered any sort of cyber attack until February 13, 2023. [5] Further, the Breach Note stated that it believed information may have been acquired between February 3, 2023 – February 14, 2023.

7.      Plaintiff's and Class Members' PII was compromised due to Defendants' negligent and/or careless acts and omissions and their failure to protect the PII of Plaintiff and Class Members.

8.      At this time, there exist many Class Members who are totally unaware their PII has been compromised, and that they are at significant risk of identity theft and various other forms of personal, social, and financial harm.

9.      Plaintiff brings this action, individually, and on behalf of all others whose PII was compromised as a result of Defendants' failure to adequately protect consumers' PII, timely discover the breach and warn its current and former customers of its inadequate information security practices, and effectively monitor its platforms for security vulnerabilities and incidents.

10.     Plaintiff and Class Members have all suffered injury as a result of the Defendants' negligent conduct, including: (i) the potential for Plaintiff's and Class Members' exposed PII to be sold and distributed on the dark web, (ii) a lifetime risk of identity theft, and sharing and detrimental use of their sensitive information, (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII, (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, and (v) the continued and increased risk to

---

[4] *Id*.
[5] *Id*.

3

their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to take appropriate and adequate measures to protect its customers' PII.

11.    Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to equitable and injunctive relief.

## I.    THE PARTIES

12.    Plaintiff Dewayne Jackson is an individual domiciled and is a citizen of Moultrie, Georgia, which is located in Colquitt County. On or about March 30, 2023, Defendants sent Plaintiff Jackson a letter informing him he had been a victim of the Data Breach.

13.    Defendant TMX Finance, LLC is the parent company of TMX Finance Corporate Services. TMX Finance, LLC was founded and has been headquartered in Savannah, Georgia since June of 2010. Through its wholly owned subsidiary, TMX Finance Corporate Services, Inc., TMX Finance, LLC operates several consumer credit and lending businesses.

14.    Defendant TMX Finance Corporate Services, Inc. is a Delaware corporation with its principal place of business at 15 Bull Street, Suite 200, Savannah, GA 31401. Defendant TMX Finance Corporate Services, Inc. operates several consumer credit and lending businesses including (i) TitleMax, Inc., which is a lending business headquartered in Dallas, Texas providing personal loans to consumers across the United States; (ii) InstaLoan, which is consumer lending company offering short-term, high interest loans, and (iii) TitleBucks, which is a consumer lending company offering auto loans to various states across the United States.

## II.    JURISDICTION AND VENUE

15.    This Court has diversity jurisdiction over this action under the Class Action Fairness Act (CAFA) and 28 U.S.C. § 1332(d) because this is a class action involving more than

100 class members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and many members of the class are citizens of states different from Defendants.

16.    This Court has personal jurisdiction over Defendants because its principal place of business is in this District, it regularly transacts business in this District, Plaintiff Jackson resides in this District, and many other Class Members reside in this District. 28 U.S.C. § 1391(b)(2).

### III.    FACTUAL ALLEGATIONS

#### A.    TMX and Its Business

17.    TMX Finance LLC, is a limited liability company headquartered in Savannah, Georgia, and through its wholly owned subsidiary, TMX Finance Corporate Services, Inc., provides consumer lending services to consumers through approximately 900 locations. TMX operates throughout the United States in states such as Alabama, Arizona, Delaware, Florida, Georgia, Mississippi, Missouri, Nevada, New Mexico, South Carolina, Tennessee, Texas, Utah, and Wisconsin.

18.    In the ordinary course of business, Defendants and/or its affiliates collect, store, and maintain the PII of its customers who take out various loans with Defendants and/or their affiliated entities. The PII includes highly sensitive personally identifiable information such as customers Social Security Numbers, driver's license numbers, passport numbers, bank account numbers, routing numbers, credit or debit card numbers, and other information such as phone numbers, addresses, and email addresses.

19.    In order to apply for a title loan, personal loan, lien loan, or other form of consumer loan from Defendants, Plaintiff and Class Members were required to and did in fact turn over PII to Defendants.

20.     For example, according to the TitleMax Privacy Policy, TitleMax admits to collecting customers' personal information when customers: (i) apply for credit or credit services or give TitleMax income information; (ii) open an account or provide employment information; (iii) show/provide TitleMax a valid government-issued ID; and (iv) provide payment account or bank account information. Further, the Privacy Policy states that TitleMax may collect and share "names, telephone number(s), social security or tax identification number, address, photo identification type and number, income information, payment history, transaction history, credit history, asset/collateral information, bank routing and account numbers, and payment card information."[6]

21.     Defendants maintain virtually identical Privacy Policies for TitleMax, TitleBucks, and InstaLoan.[7]

22.     In each of the Privacy Policies Defendants falsely warrant that they will "protect your [Plaintiff and Class Members] personal information from unauthorized access and use", and "use security measures that comply with federal law." Next, the Privacy Policies claim that such measures include "computer and mobile application safeguards and secured files and buildings", and "physical, electronic, and procedural safeguards (i.e., computer virus protection software, firewalls, encryption)."

23.     Despite their promises to safeguard Plaintiff and Class Members' PII, Defendants failed to implement and adopt reasonable measures to protect against involuntary disclosures to unauthorized third parties.

---

[6] *See* https://www.tmxdisclosures.com/titlemax/privacy-policy

[7] *See* https://www.tmxdisclosures.com/instaloan/privacy-policy and
https://www.tmxdisclosures.com/titlebucks/privacy-policy

24.     Defendants had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to unauthorized third parties.

**B.      The Data Breach**

25.     On or about March 30, 2023, in its Breach Notice, Defendants acknowledged a nationwide breach occurred that affected the PII of customers of the Defendants and its affiliates, such as TitleMax, TitleBucks, and InstaLoan.[8]

26.     The Breach Notice states that based on an investigation, "the earliest known breach of TMX's systems started in early December 2022", and the compromise of information occurred sometime between February 3, 2023, and February 14, 2023.

27.     The Breach Notice goes on to state that information compromised may have included, "your name, date of birth, passport number, driver's license number, federal/state identification card number, social security number and/or financial account information, and other information such as phone numbers, address, and email address."

28.     According to the Attorney General for the State of Maine, Defendants' external system breach affected 4,822,580 individuals.

29.     As of today, Defendants have provided affected individuals vague information in its Breach Notice on the steps it has taken to remedy the breach to ensure another breach does not occur again. The information provided merely states, "[w]e have implemented additional security features, such as additional endpoint protection and monitoring, as well as resetting all employee passwords."

30.      In addition, Defendants are offering wholly inadequate complimentary credit monitoring and identity protection services from Experian IdentityWorks for a single year.

---

[8] *See* **Exhibit 1**

Defendants' mere year-long offer fails to acknowledge the long-term harm and risk of harm that will plague Plaintiff and Class Members for the foreseeable future as a result of the Data Breach.

31.     Further, it took Defendants three (3) months to begin the process of discovering the Data Breach and start notifying affected consumers, including Plaintiff and Class Members, that their PII was compromised by the Data Breach. As a result, Plaintiff and Class Members PII was accessed by the Data Breach, left in a vulnerable state without their knowledge for three (3) months, and now remains open to further compromise while in Defendants' possession.

32.     Defendants were obligated by contract, industry standards, common law, and representations made to Plaintiff and Class Members to keep their PII confidential and to protect it from unauthorized access and disclosure.

33.     Defendants failed to use reasonable security procedures and practices suitable or adequate to protect the PII it was maintaining for Plaintiff and Class Members, which caused the unauthorized access and compromise of the PII of more than 4.8 million individuals.

34.     For the foreseeable future, Plaintiff and Class Members must now experience the increased risk of having their PII readily accessible and available for misuse, theft, and disclosure by unauthorized third parties and cybercriminals.

### C.    Plaintiff's Experiences

**Plaintiff Dewayne Jackson**

35.     Upon information and belief, Plaintiff Jackson obtained loans or other services from Defendants or their affiliates prior to the Data Breach and received Defendants' Breach Notice on or around March 30, 2023.

36.     As a result of the Data Breach, Plaintiff's PII was accessed and/or acquired by an unauthorized actor. For the rest of his life, Plaintiff will have to worry about when and how his PII may be shared or used to his detriment.

37.    As a result of the Data Breach, Plaintiff has spent time and effort dealing with the consequences of the Data Breach, which includes time spent responding to and verifying the legitimacy of the Breach Notice, self-monitoring his accounts, and the future time spent worrying about potential breaches of his PII.

38.    Plaintiff has spent numerous hours responding to the Data Breach. Among other things, Plaintiff has spent time monitoring his accounts and personal information, investigating the scope of the Data Breach, and taking other steps in an attempt to mitigate the adverse impact of the Data Breach.  Due to the permanent and sensitive nature of some of the PII exposed in the Breach (such as Social Security numbers), Plaintiff will be required to continuously monitor his identity and credit for the rest of his life.

39.    Because the Data Breach was an intentional hack by cybercriminals seeking information of value that they could exploit, Plaintiff is at imminent and substantial risk of identity theft that is continuous and ongoing.

40.    Plaintiff has always been careful to protect and monitor his identity by securing documents containing his PII in a safe and secure location and diligently chooses unique usernames and passwords for his various online accounts.

41.    To his knowledge, Plaintiff has not been the victim of any other data breach.

**D.    Cyber Criminals Will Use Plaintiff's PII to Defraud Him**

42.    PII is of great value to hackers and cyber criminals, and the data stolen in the Data Breach can and will be used in a variety of ways by criminals to exploit Plaintiff and the Class Members to profit off their misfortune.

43.     Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[9] For example, with the PII stolen in the Data Breach, including Social Security numbers, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[10] These criminal activities have and will result in devastating financial and personal losses to Plaintiff Jackson and the Class Members.

44.     Social security numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> **Social Security number.** *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[11]

[Emphasis added.]

45.     This was a financially motivated Breach, as the only reason the cyber criminals go through the trouble of running a targeted cyberattack against companies like TMX is to get information that they can monetize by selling it on the black market for use in the kinds of criminal activity described herein.  Indeed, a social security number, date of birth, and full name can sell

---

[9] "Facts + Statistics: Identity Theft and Cybercrime," Insurance Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").

[10] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[11] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

for $60 to $80 on the digital black market.[12]  "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[13]

46.     Hackers may not use the information right away, but this does not mean it will not be used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information *may continue for years*. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[14]

47.     For instance, with a stolen social security number, which is part of the PII compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[15]

48.     Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.

49.     Defendants' offer of one year of credit and identity monitoring to Plaintiff and the Class is woefully inadequate and will not fully protect them from the damages and harm caused by Defendants' cybersecurity failures. While some harm has begun already, the full scope of the harm has yet to be realized. There may be a time lag between when harm occurs versus when it is

---

[12] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, Nov. 15, 2017, https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.

[13] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

[14] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, June 4, 2007, https://www.gao.gov/assets/gao-07-737.pdf

[15] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

discovered, and also between when PII is stolen and when it is used. Once the twelve-months have expired, Plaintiff and Class Members will need to pay for their own identity theft protection and credit monitoring for the rest of their lives due to Defendants' gross negligence. Furthermore, identity monitoring only alerts someone to the fact that they have *already been the victim of identity theft* (*i.e.*, fraudulent acquisition and use of another person's PII)—it does not prevent identity theft.[16] Nor can an identity monitoring service remove personal information from the dark web.[17] "The people who trade in stolen personal information [on the dark web] won't cooperate with an identity theft service or anyone else, so it's impossible to get the information removed, stop its sale, or prevent someone who buys it from using it."[18]

50.     As a direct and proximate result of the Data Breach, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from continued fraud and identity theft. Plaintiff and Class Members must now take the time and effort to mitigate the actual and potential impact of the Data Breach in their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come. Even more seriously is the identity restoration that Plaintiff and other Class Members must go through, which can include spending countless hours filing police reports, filling out IRS forms, Federal Trade Commission checklists, Department of Motor Vehicle driver's license replacement applications, and calling financial

---

[16] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, Nov. 30, 2017, https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html.

[17] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

[18] *Id.*

institutions to cancel fraudulent credit applications, to name just a few of the steps Plaintiff and Class Members must take.

51.    Plaintiff and Class Members have suffered, and continue to suffer, actual harms for which they are entitled to compensation, including:

     a.  Trespass, damage to, and theft of their personal property including PII;

     b.  Improper disclosure of their PII;

     c.  The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

     d.  Loss of privacy suffered as a result of the Data Breach, including the harm of knowing cyber criminals have their PII and that identity thieves may use that information to defraud other victims of the Data Breach;

     e.  Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach; and

     f.  Ascertainable losses in the form of deprivation of the value of Plaintiff's and Class Members' personal information for which there is a well-established and quantifiable national and international market.

52.    Moreover, Plaintiff and Class Members have an interest in ensuring that their information, which remains in the possession of Defendants, is protected from further breaches by the implementation of industry standard security measures and safeguards. Defendants have shown themselves wholly incapable of protecting Plaintiff's and Class Members' PII.

53.    Defendants themselves acknowledged the harm caused by the Data Breach because it offered Plaintiff and Class Members the woefully inadequate twelve months of identity theft

repair and credit monitoring services. Twelve months of credit and identity theft monitoring is, however, inadequate to protect Plaintiff and Class Members from a lifetime of identity theft risk.[19]

54.    Defendants further acknowledged, in its letter to Plaintiff and other Class Members, that TMX needed to improve its security protocols, stating: "[w]e have implemented additional security features, such as additional endpoint protection and monitoring, as well as resetting all employee passwords. We continue to evaluate ways to further enhance the security of our systems."[20]

55.    The Breach Notice further acknowledged that the Data Breach would cause inconvenience to affected individuals and that financial harm would likely occur, stating: "We encourage you to remain vigilant against potential identity theft and fraud by carefully reviewing credit reports and account statements to ensure that all activity is valid."

56.    At Defendants' suggestion, Plaintiff and Class Members are desperately trying to mitigate the damage that Defendants' Data Breach has caused them.  Given the kind of PII Defendants made accessible to hackers, however, Plaintiff and Class Members are certain to incur additional damages. Because identity thieves have their PII, Plaintiff and Class Members will need to have identity theft monitoring protection for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the loss of credit and employment difficulties that come with a new number.[21]

57.    None of this should have happened.

---

[19] *See* **Exhibit 1**, attached hereto.

[20] *Id.*

[21] *Will a New Social Security Number Affect Your Credit?*, LEXINGTON LAW (Nov. 16, 2015), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html.

### E.  Defendants Were Aware of the Risk of Cyber Attacks

58.    Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of some of the biggest cybersecurity breaches: Target,[22] Yahoo,[23] Marriott International,[24] Chipotle, Chili's, Arby's,[25] and others.[26]

59.    Defendants, who provide consumer credit products to individuals throughout the United States requiring the collection and maintenance of highly sensitive and valuable PII, should certainly have been aware, and indeed was aware, that it was at risk for a data breach that could expose the PII that it collected and maintained.

60.    With the increasing prevalence of data breach announcements, Defendants certainly recognized it had a duty to use reasonable measures to protect the wealth of PII that it collected and maintained.

61.    In 2022, a total of 1,802 data breaches occurred, which represents the second highest number of data events in a single year and just 60 events short of the all-time record of 1,862 in 2021. The financial services industry was the second leading industry, behind healthcare,

---

[22] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/.

[23] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html.

[24] Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/.

[25] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b.

[26] *See, e.g.*, Taylor Armerding, *The 18 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Dec. 20, 2018), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html.

for the number of data compromises for 2022 with 268 compromises affecting 27,146,354 individuals.[27]

62.    In light of the significant number of data breaches that occurred in the financial services industry in 2022, Defendants knew or should have known that its customers' PII would be targeted by cybercriminals.

63.    Defendants were clearly aware of the risks it was taking and the harm that could result from inadequate data security.

### F.  Defendants Could Have Prevented the Breach

64.    Data breaches are preventable.[28] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[29] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[30]

65.    "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[31]

---

[27] ITRC_2022-Data-Breach-Report_Final-1.pdf (idtheftcenter.org)

[28] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).

[29] *Id.* at 17.

[30] *Id.* at 28.

[31] *Id.*

66.     In a Data Breach like this, many failures laid the groundwork for the Breach.  The FTC has published guidelines that establish reasonable data security practices for businesses. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[32]  The guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommended that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

67.     Upon information and belief, Defendants failed to maintain many reasonable and necessary industry standards necessary to prevent a data breach, including the FTC's guidelines. Upon information and belief, Defendants also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity preparation.

68.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[33]

---

[32] FTC, *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[33] *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

69.    To prevent and detect cyber-attacks, including the attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[34]

70.     Further, to prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**.  Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**.  Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**.  Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**.  If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

---

[34] *Id.* at 3-4.

- **Inform yourself**.  Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[35]

71.    In addition, to prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**

    - Apply latest security updates
    - Use threat and vulnerability management
    - Perform regular audit; remove privileged credentials

- **Thoroughly investigate and remediate alerts**

    - Prioritize and treat commodity malware infections as potential full compromise;

- **Include IT Pros in security discussions**

    - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**

    - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**

    - Monitor for adversarial activities
    - Hunt for brute force attempts
    - Monitor for cleanup of Event Logs

---

[35] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://us-cert.cisa.gov/ncas/tips/ST19-001.

- Analyze logon events

- **Harden infrastructure**

   - Use Windows Defender Firewall
   - Enable tamper protection
   - Enable cloud-delivered protection
   - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[36]

72.    Given that Defendants were storing the PII of thousands of individuals, Defendants could and should have implemented all of the above measures to prevent and detect ransomware attacks.

73.    Specifically, among other failures, Defendants had far too much confidential unencrypted information held on its systems.  Such PII should have been segregated into an encrypted system.[37]

74.    Moreover, it is well-established industry standard practice for a business to dispose of confidential PII once it is no longer needed.  The FTC, among others, has repeatedly emphasized the importance of disposing unnecessary PII, saying simply: "Keep sensitive data in your system only as long as you have a business reason to have it.  Once that business need is over, properly dispose of it.  If it's not on your system, it can't be stolen by hackers."[38]  Defendants, rather than following this basic standard of care, kept millions of individuals' unencrypted PII indefinitely.

---

[36] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

[37] *See, e.g.,* Adnan Raja, *How to Safeguard Your Business Data with Encryption*, Aug. 14, 2018, https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption.

[38] FTC, *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf at p. 6.

75.    In sum, this Data Breach could have readily been prevented through the use of industry standard network segmentation and encryption of all PII.  Further, the scope of the Data Breach could have been dramatically reduced had Defendants utilized proper record retention and destruction practices.

**G.  Defendants' Response to the Data Breach is Inadequate to Protect Plaintiff and the Class**

76.    Defendants failed to inform Plaintiff and Class Members of the Data Breach in time for them to protect themselves from identity theft.

77.    Defendants stated that the "earliest known breach of TMX's systems started in early December of 2022." And yet, Defendants did not start notifying affected individuals until on or about March 30, 2023—three (3) months after the earliest known breach.

78.    During these intervals, the cybercriminals have the opportunity to exploit the Plaintiff and Class Members' PII while Defendants were secretly still investigating the Data Breach.

**H.  Defendants Failed to Comply with FTC Guidelines**

79.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

80.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand

their network's vulnerabilities; and implement policies to correct any security problems.[39] The guidelines also recommend businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

81.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

82.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

83.    Defendants were always fully aware of their obligations to protect the PII of Plaintiff and Class Members and the significant repercussions that would result from its failure to do so.

## IV.    CLASS ACTION ALLEGATIONS

84.    Plaintiff incorporates by reference all preceding paragraphs as if fully restated here.

85.    Plaintiff brings this action against Defendants on behalf of themselves and all other individuals similarly situated under Federal Rule of Civil Procedure 23. Plaintiff asserts all claims on behalf of a nationwide class (the "Class") defined as follows:

---

[39] https://www.bulkorder.ftc.gov/system/files/publications/2_9-00006_716a_protectingpersinfo-508.pdf

All natural persons residing in the United States whose personal identifiable information (PII) was compromised as a result of the Data Breach announced by Defendants on or about March 30, 2023

86.    Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staff.

87.    Plaintiff reserves the right to amend the above definition or to propose subclasses in subsequent pleadings and motions for class certification.

88.    The proposed Class meets the requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and (c)(4).

89.    **Numerosity:** The proposed Class is so numerous that joinder of all members is impracticable. According to the Attorney General for the State of Maine Data Breach Notifications, the total number of persons affected by the Data Breach is 4,822,580.

90.    **Typicality:** Plaintiff's claims are typical of the claims of the Class. Plaintiff and all members of the Class were injured through Defendants' uniform misconduct. All had their PII compromised as a result of the Data Breach.

91.    **Adequacy:** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the Class; Plaintiff has retained counsel competent and highly experienced in data breach class action litigation; and Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and their counsel.

92.    **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual class

member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for members of the Class individually to effectively redress Defendants' wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

93.    **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

     a.  When Defendants actually learned of the Data Breach and whether its response was adequate;

     b.  Whether Defendants failed to adequately safeguard Plaintiff's and Class Members' PII;

     c.  Whether Defendants owed a duty to Plaintiff and the Class to adequately protect their PII, and whether it breached this duty;

     d.  Whether Defendants breached its duties to Plaintiff and the Class as a result of the Data Breach;

     e.  Whether Defendants failed to provide adequate cyber security;

f.  Whether Defendants knew or should have known that its computer and network security systems were vulnerable to cyber-attacks;

g.  Whether Defendants' conduct, including its failure to act, resulted in or was the proximate cause of the breach of its company network;

h.  Whether Defendants were negligent in permitting unencrypted PII off vast numbers of individuals to be stored within its network;

i.  Whether Defendants were negligent in failing to adhere to reasonable retention policies, thereby greatly increasing the size of the Data Breach to include former employees and business associates;

j.  Whether Defendants breached implied contractual duties to Plaintiff and Class Members to use reasonable care in protecting their PII;

k.  Whether Defendants failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and Class Members;

l.  Whether Defendants continue to breach duties to Plaintiff and Class Members;

m.  Whether Plaintiff and the Class suffered injury as a proximate result of Defendants' negligent actions or failures to act;

n.  Whether Plaintiff and the Class are entitled to recover damages, equitable relief, and other relief; and

o.  Whether Defendants' actions alleged herein constitute gross negligence, and whether Plaintiff and Class Members are entitled to punitive damages.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### NEGLIGENCE
#### (On Behalf of Plaintiff and the Class)

94.    Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

95.    Defendants solicited, gathered, and stored the PII of Plaintiff and Class Members.

96.    Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed. Defendants had a duty to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting that information. Plaintiff and Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and the Class Members had no ability to protect their PII that was in Defendants' possession. As such, a special relationship existed between the Defendants and the Plaintiff and Class Members.

97.    Defendants were well aware of the fact that cyber criminals routinely target corporations in the financial services industry through cyberattacks in an attempt to steal the PII of employees, applicants, business associates, and customers.

98.    Defendants owed Plaintiff and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when obtaining, storing, using, and managing personal information, including taking action to reasonably safeguard such data and provide notification to Plaintiff and Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

99.    Defendants had duties to protect and safeguard the PII of Plaintiff and Class Members from potential cyberattacks, including by encrypting any document or report containing PII, by not permitting documents containing unencrypted PII to be maintained on its systems, and

27

other similarly common-sense precautions when dealing with sensitive PII. Additional duties that Defendants owed Plaintiff and Class Members include:

    a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the PII in its possession;

    b. To protect the PII in its possession using reasonable and adequate security procedures and systems;

    c. To adequately and properly audit and test its systems;

    d. To adequately and properly audit, test, and train its employees regarding how to properly and securely transmit and store PII;

    e. To train its employees not to store PII for longer than absolutely necessary;

    f. To implement processes to quickly detect a data breach, security incident, or intrusion; and

    g. To promptly notify Plaintiff and Class Members of any data breach, security incident, or intrusion that affected or may have affected their PII.

100.    Plaintiff and Class Members were the intended beneficiaries of Defendants' duties, creating a special relationship between them. Defendants were in a position to ensure that its systems were sufficient to protect the PII that Plaintiff and the Class had entrusted to it.

101.    Defendants breached its duties of care by failing to adequately protect Plaintiff's and Class Members' PII. Defendants breached its duties by, among other things:

    a. Failing to exercise reasonable care in obtaining, retaining securing, safeguarding, deleting, and protecting the PII in its possession;

    b. Failing to protect the PII in its possession using reasonable and adequate security procedures and systems;

    c. Failing to adequately and properly audit and test its computer systems to avoid cyberattacks;

    d.   Failing to adequately and properly audit, test, and train its employees regarding how to properly and securely transmit and store PII, including maintaining PII in an encrypted format;

    e.   Failing to adequately and properly train its employees not to store PII for longer than absolutely necessary;

    f.   Failing to consistently enforce security policies aimed at protecting Plaintiff and Class Members' PII;

    g.   Failing to implement processes to quickly detect data breaches, security incidents, or intrusions;

    h.   Failing to abide by reasonable retention and destruction policies for PII of former employees, applicants, business associates, and customers; and

    i.   Failing to promptly and accurately notify Plaintiff and Class Members of the Data Breach that affected their PII.

102.    Defendants' willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

103.    As a proximate and foreseeable result of Defendants' grossly negligent conduct, Plaintiff and Class Members have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

104.    The damages Plaintiff and Class Members have suffered (as alleged above) were and are reasonably foreseeable.

105.    The damages Plaintiff and the Class have and will suffer were and are the direct and proximate result of Defendants' grossly negligent conduct.

106.    Plaintiff and the Class have suffered injury and are entitled to actual and punitive damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
## BREACH OF IMPLIED CONTRACT
**(On Behalf of Plaintiff and the Class)**

107.    Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

108.    Plaintiff's and Class Members' PII was provided to Defendants as a condition of their receipt of consumer loans.

109.    When Plaintiff and Class Members provided their PII to Defendants as part of their consumer loan servicing, they entered into implied contracts in which Defendants agreed to comply with its statutory and common law duties to protect their PII and to timely notify them in the event of a Data Breach.

110.    Based on Defendants' legal obligations and acceptance of Plaintiff's and Class Members' PII, Defendants had an implied duty to safeguard their PII through the use of reasonable industry standards.

111.    Defendants breached the implied contracts by failing to safeguard Plaintiff's and Class Members' PII and failing to provide them with timely and accurate notice of the Data Breach. Indeed, it took Defendants approximately three (3) months to warn Plaintiff and Class Members of their imminent risk of identity theft.

112.    As a direct and proximate result of Defendant's breach of implied contract, Plaintiff and the Class Members have suffered damages, including foreseeable consequential damages that Defendants knew about when it requested Plaintiff's and the Class Members' PII.

113. Plaintiff and the Class have suffered injury, and are entitled to actual and punitive damages, statutory damages, and reasonable attorneys' fees and costs, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

114. Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

115. Plaintiff and Class Members conferred a monetary benefit on Defendants by providing Defendants with profits from the servicing of Plaintiff's and Class Members' consumer loans.

116. Defendants appreciated that a monetary benefit was being conferred upon it by Plaintiff and Class Members and accepted that monetary benefit.

117. However, acceptance of the benefit under the facts and circumstances outlined above make it inequitable for Defendants to retain that benefit without payment of the value thereof. Specifically, Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants calculated to increase their own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize its own profits over the requisite data security.

118.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary benefit belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures.

119.    Defendants acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

120.    If Plaintiff and Class Members knew that Defendants had not secured their PII, they would not have agreed to provide their PII to Defendant.

121.    Plaintiff and Class Members have no adequate remedy at law. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered or will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect PII in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

122.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

123.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, all gains that they unjustly received.

### FOURTH CAUSE OF ACTION
### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

124.    Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

125.    Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

126.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect PII.  The FTC publications and orders also form part of the basis of Defendants' duty in this regard.

127.    Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect consumers PII and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiff and Class Members.

128.    Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se* as Defendants' violation of the FTC Act establishes the duty and breach elements of negligence.

129.    Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

130.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act intended to guard against. The FTC has pursued enforcement actions against businesses,

which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

131.    But for Defendants' wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

132.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties, and that Defendants' breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their PII.

133.    As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Class)**

134.    Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

135.    A relationship existed between Plaintiff and Class Members and Defendants in which Plaintiff and the Class put their trust in Defendants to protect their PII. Defendants accepted this duty and obligation when it received Plaintiff's and Class Members' PII.

136.    Plaintiff and Class Members entrusted their PII to Defendants on the premise and with the understanding that Defendants would safeguard their information, use their PII for business purposes only, and refrain from disclosing their PII to unauthorized third parties.

137.    Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of its current and former customers' PII involved an

unreasonable risk of harm to Plaintiff and the Class, including harm that foreseeably could occur through the criminal acts of a third party.

138.    Defendants' fiduciary duty required it to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendants' security protocols to ensure that Plaintiff's and the Class's information in Defendants' possession was adequately secured and protected.

139.    Defendants also had a fiduciary duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiff's and the Class's PII. Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between

140.    Defendants and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendants with their confidential PII, a necessary part of obtaining services.

141.    Defendants breached the fiduciary duty that it owed Plaintiff and the Class by failing to act in good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect the PII of Plaintiff and Class Members.

142.    Defendants' breach of fiduciary duty was a legal cause of damage to Plaintiff and the Class.

143.    But for Defendants' breach of fiduciary duty, the damage to Plaintiff and the Class would not have occurred, and the Data Breach contributed substantially to producing the damage to Plaintiff and the Class.

144.   As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiff is entitled to actual, consequential, and nominal damages and injunctive relief, with amounts to be determined at trial.

### SIXTH CAUSE OF ACTION
### BREACH OF CONFIDENTIALITY
### (On Behalf of Plaintiff and the Class)

145.   Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

146.   At all times during Plaintiff's and Class Members' interactions with Defendants, Defendants were fully aware of the confidential and sensitive nature of Plaintiff's and Class Members' PII.

147.   Plaintiff's and Class Members' PII constitutes confidential and novel information. Indeed, Plaintiff's and Class Members' Social Security numbers can be changed only with great difficulty and time spent, which still enables a threat actor to exploit such information during the interim. Additionally, an individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted as an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

148.   As alleged herein and above, Defendants' relationships with Plaintiff and Class Members were governed by terms and expectations that their PII would be collected, stored, and protected in confidentiality, and would not be disclosed to unauthorized third parties.

149.   Plaintiff and Class Members provided their respective PII to Defendants with the explicit and implicit understanding that Defendants would protect and not permit the PII to be disseminated to any unauthorized parties.

150. Defendants voluntarily received in confidentiality Plaintiff's and Class Members' PII with the understanding that such information would not be disclosed or disseminated to the public or any unauthorized third parties.

151. Due to Defendants' failure to prevent, detect, and avoid the Data Breach from occurring Plaintiff's and Class Members' PII was disclosed and misappropriated to unauthorized third parties beyond their confidence, and without their express permission.

152. As a direct and proximate cause of Defendants' actions and/or omissions, Plaintiff and Class Members have suffered damages.

153. This disclosure of Plaintiff's and Class Members' PII constituted a violation of Plaintiff's and Class Members' understanding that Defendants would safeguard and protect the confidential and novel PII that Plaintiff and Class Members were required to disclose to Defendants.

154. The concrete injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Defendants' failure to provide adequate safeguards to prevent the unauthorized access of Plaintiff's and Class Members' PII.

155. As a direct and proximate result of Defendants' breaches of confidentiality, Plaintiff and Class Members have suffered and/or are at a substantial risk of suffering concrete injury that includes but is not limited to: (a) actual identity theft; (b) the compromise, publication, and/or theft of their PII; (c) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (d) lost opportunity costs

associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (e) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in its continued possession; and (f) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

### SEVENTH CAUSE OF ACTION
### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (On Behalf of Plaintiff and the Class)

156.    Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

157.    As described above, when Plaintiff and Class Members provided their PII to Defendants, they entered into implied contracts in which Defendants agreed to comply with their statutory and common law duties and industry standards to protect Plaintiff's and Class Members' PII and timely detect and notify them in the event of a data breach.

158.    These exchanges constituted an agreement between the parties: Plaintiff and Class Members were required to provide their PII to Defendants in exchange for consumer loan services provided by Defendants.

159.    It was clear by these exchanges that the parties intended to enter into an agreement. Plaintiff and Class Members would not have voluntarily disclosed their PII to Defendants but for the prospect of Defendants' promise of providing consumer loan services. Conversely, Defendants presumably would not have received Plaintiff's and Class Members' PII if it did not intend to provide consumer loan services.

160.   Implied in these exchanges was a promise by Defendants to ensure the Plaintiff's and Class Members' PII was only used to provide consumer loan services from Defendant.

161.   Plaintiff and Class Members therefore did not receive the benefit of the bargain with Defendants, because they provided their PII in exchange for Defendants' implied agreement to keep it safe and secure.

162.   While Defendants had discretion in the specifics of how they met the applicable laws and industry standards, this discretion was governed by an implied covenant of good faith and fair dealing.

163.   Defendants breached this implied covenant when they engaged in acts and/or omissions that are declared unfair trade practices by the FTC. These acts and omissions included: failing to protect Plaintiff's and Class members' PII and failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

164.   Plaintiff and Class Members did all or substantially all the significant things that the contract required them to do. All conditions required for Defendants' performance were met.

165.   Defendants' acts or omissions unfairly interfered with Plaintiff's and Class Members' rights to receive the full benefit of their contracts.

166.   Plaintiff and Class Members have been or will be harmed by Defendants' breach of this implied covenant in the many ways described above, including actual identity theft and/or imminent risk of certainly impending and devastating identity theft that exists now that cyber criminals have obtained their PII, and the attendant long-term expense of attempting to mitigate and insure against these risks.

167.   Defendants are liable for their breaches of these implied covenants, whether or not they are found to have breached any specific express contractual term.

168.    Plaintiff and Class Members are entitled to damages, including compensatory damages and restitution, declaratory and injunctive relief, and attorney fees, costs, and expenses.

**EIGHTH CAUSE OF ACTION**
**INJUNCTIVE AND DECLARATORY RELIEF**
**(On Behalf of Plaintiff and the Class)**

169.    Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

170.    This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

171.    As previously alleged and pleaded, Defendants owe duties of care to Plaintiff and Class Members that require them to adequately secure their PII.

172.    Defendants still possess the PII of Plaintiff and the Class Members.

173.    Defendants have not satisfied its contractual obligations and legal duties to Plaintiff and the Class Members.

174.    Defendants have claimed that it is taking some steps to increase its data security, but there is nothing to prevent Defendants from reversing these changes once it has weathered the increased public attention resulting from this Breach, and to once again place profits above protection.

175.    Plaintiff, therefore, seeks a declaration (1) that Defendants' existing security measures do not comply with its contractual obligations and duties of care to provide adequate security, and (2) that to comply with its contractual obligations and duties of care, Defendants' must implement and maintain reasonable security measures, including, but not limited to:

      a.    Ordering Defendants to engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis,

and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

b.  Ordering Defendants to significantly increase its spending on cybersecurity including systems and personnel;

c.  Ordering Defendants to engage third-party security auditors and internal personnel to run automated security monitoring;

d.  Ordering that Defendants audit, test, and train their security personnel regarding any new or modified procedures;

e.  Ordering that Defendants protect Plaintiff's and the Class's PII by, among other things, creating firewalls and access controls so that if one area of Defendants' systems are compromised, hackers cannot gain access to other portions of Defendants' systems;

f.  Ordering that Defendants cease storing unencrypted PII on its systems;

g.  Ordering that Defendants conduct regular database scanning and securing checks;

h.  Ordering Defendants to routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

i.  Ordering Defendants to implement and enforce adequate retention policies for PII, including destroying, in a reasonably secure manner, PII once it is no longer necessary for it to be retained; and

j.  Ordering Defendants to meaningfully educate its current, former, and prospective employees and subcontractors about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps they must take to protect themselves.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendants as follows:

a. An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

b. A judgment in favor of Plaintiff and the Class awarding them appropriate monetary relief, including compensatory damages, punitive damages, attorney fees, expenses, costs, and such other and further relief as is just and proper;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d. An order requiring Defendants to pay the costs involved in notifying the Class Members about the judgment and administering the claims process;

e. A judgment in favor of Plaintiff and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law; and

f. An award of such other and further relief as this Court may deem just and proper.

## VII.    DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all appropriate issues raised in this Class Action Complaint.

Dated:  April 13, 2023                                    Respectfully submitted,

By:    */s/ Rebecca Franklin Harris*
Rebecca Franklin Harris
Georgia Bar No. 141350
rebecca@franklinlawllc.com
**FRANKLIN LAW, LLC**
2250 E. Victory Dr., Suite 102
Savannah, GA 31404
Phone: 912.335.3305
Fax: 912.335.3305

James M. Evangelista
Georgia Bar No. 707807
jim@ewlawllc.com
**EVANGELISTA WORLEY, LLC**
500 Sugar Mill Road, Suite 245A
Atlanta, GA 30350
Telephone: (404) 205-8400
Fax: (404)205-8395

William B. Federman
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
wbf@federmanlaw.com

**TMX** FINANCE | FAMILY OF COMPANIES
TitleMax, [illegible] [illegible]

Return Mail Processing
PO Box 999
Savannah, GA 31624

[barcode line, illegible]
DEWAYNE JACKSON
████████████████████████████
[illegible address lines]

March 30, 2023

## NOTICE OF DATA BREACH

Dear Dewayne Jackson

TMX Finance Corporate Services, Inc., on behalf of itself, its parent TMX Finance LLC and its affiliates, many of which operate under the brands "TitleMax," "TitleBucks," and "InstaLoan" (collectively, "TMX"), is writing to inform you of a data breach that may have involved your personal information. TMX takes the privacy and security of your personal information very seriously. This letter provides information about the incident and resources available to help you protect your information.

**What Happened?** On February 13, 2023, we detected suspicious activity on our systems and promptly took steps to investigate the incident. As part of that investigation, global forensic cybersecurity experts were retained. Based on the investigation to date, the earliest known breach of TMX's systems started in early December 2022. On March 1, 2023, the investigation confirmed that information may have been acquired between February 3, 2023 – February 14, 2023. We promptly began a review of potentially affected files to determine what information may have been involved in this incident. We notified the FBI but have not delayed this notification for any law enforcement investigation.

**What Information Was Involved?** The personal information involved may have included your name, date of birth, passport number, driver's license number, federal/state identification card number, tax identification number, social security number and/or financial account information, and other information such as phone number, address, and email address.

**What We Are Doing.** Our investigation is still in progress, but TMX believes the incident has been contained. We continue to monitor our systems for any suspicious activity. We have implemented additional security features, such as additional endpoint protection and monitoring, as well as resetting all employee passwords. We continue to evaluate ways to further enhance the security of our systems.

To help protect your identity, we are offering you complimentary credit monitoring and identity protection services through Experian IdentityWorks℠ for a period of 12 months. Please see the enclosed Reference Guide for enrollment details and instructions on how to enroll.

**What You Can Do.** In addition to enrolling in complimentary credit monitoring and identity protection services, the Reference Guide includes additional information on general steps you can take to monitor and protect your personal information. We encourage you to remain vigilant against potential identity theft and fraud by carefully reviewing credit reports and account statements to ensure that all activity is valid.

**For More Information.** We sincerely regret any inconvenience or concern caused by this incident. If you have further questions or concerns, or would like an alternative to enrolling online, please call 800-632-6976 toll-free Monday through Friday from 8 am – 10 pm Central, or Saturday and Sunday from 10 am – 7 pm Central (excluding major U.S. holidays). Be prepared to provide your engagement number B6875K7.

Sincerely,

Ted Helgesen
COO and President
TMX

## Reference Guide

**Enroll in Free Credit Monitoring and Identity Protection Services:**

To help protect your identity, we are offering free access to Experian IdentityWorks℠ for 12 months.

This product provides you with superior identity detection and resolution of identity theft. To start monitoring your personal information, please follow the steps below:

- Ensure that you **enroll by July 31, 2023** (Your code will not work after this date.)
- Visit the Experian IdentityWorks website to enroll: https://www.experianidworks.com/credit
- Provide your **activation code**: ▇▇▇▇▇▇

If you have questions about the product, need assistance with Identity Restoration that arose as a result of this incident, or would like an alternative to enrolling in Experian IdentityWorks online, please contact Experian's customer care team at 800-632-6978 by **July 31, 2023**. Be prepared to provide engagement number ▇▇▇▇ as proof of eligibility for the Identity Restoration services by Experian.

**ADDITIONAL DETAILS REGARDING YOUR 12-MONTH EXPERIAN IDENTITYWORKS MEMBERSHIP:**

A credit card is not required for enrollment in Experian IdentityWorks. You can contact Experian immediately regarding any fraud issues, and have access to the following features once you enroll in Experian IdentityWorks:

- Experian credit report at signup: See what information is associated with your credit file. Daily credit reports are available for online members only.*
- Credit Monitoring: Actively monitors Experian file for indicators of fraud.
- Identity Restoration: Identity Restoration specialists are immediately available to help you address credit and non-credit related fraud.
- Experian IdentityWorks ExtendCARE™: You receive the same high-level of Identity Restoration support even after your Experian IdentityWorks membership has expired.
- $1 Million Identity Theft Insurance**: Provides coverage for certain costs and unauthorized electronic fund transfers.

**Review Your Account Statements and Notify Law Enforcement of Suspicious Activity:** Carefully review account statements and credit reports to ensure that all of your account activity is valid. Report any questionable charges promptly to the financial institution or company with which the account is maintained. You also should promptly report any fraudulent activity or any suspected incidence of identity theft to proper law enforcement authorities, your state attorney general, and/or the Federal Trade Commission (FTC).

**Order Your Free Credit Report:** To order your free annual credit report, visit www.annualcreditreport.com, call toll-free at 1-877-322-8228, or complete the Annual Credit Report Request Form (available at www.annualcreditreport.com) and mail it to Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA, 30348-5281. You also can contact one or more of the following three national consumer reporting agencies:

- **Equifax**: P.O. Box 740241, Atlanta, GA 30374, 1-800-525-6285, https://www.equifax.com/personal/credit-report-services
- **Experian**: P.O. Box 9532, Allen, TX 75013, 1-888-397-3742, www.experian.com/help
- **TransUnion**: P.O. Box 2000, Chester, PA 19016, 1-800-916-8800, www.transunion.com/credit-help

When you receive your credit reports, review them carefully. Look for accounts or creditor inquiries that you did not initiate or do not recognize. If you see anything you do not understand, call the consumer reporting agency at the telephone number on the report.

* Offline members will be eligible to call for additional reports quarterly after enrolling.
** The Identity Theft Insurance is underwritten and administered by American Bankers Insurance Company of Florida, an Assurant company. Please refer to the actual policies for terms, conditions, and exclusions of coverage. Coverage may not be available in all jurisdictions.

Engagement # 8087587

**Consider Placing a Fraud Alert on Your Credit Report:** You have the right to place an initial or extended "fraud alert" on your credit report at no cost. An initial fraud alert lasts 1-year and can be renewed as many times as desired. Upon seeing a fraud alert display on a consumer's credit file, a business is required to take steps to verify the consumer's identity before extending new credit. If you are a victim of identity theft, you are entitled to an extended fraud alert, which is a fraud alert lasting seven years. To place a fraud alert on your credit report, contact any one of the consumer reporting agencies listed below. The agency you contact will then contact the other two credit agencies.

- **Equifax Information Services:** P.O. Box 105069 Atlanta, GA 30348-5069, 1-800-525-6285, or by visiting: https://www.equifax.com/personal/credit-report-services/credit-fraud-alerts/
- **Experian Fraud Alert:** P.O. Box 9554, Allen, TX 75013-9554, 1-888-397-3742, or by visiting: https://www.experian.com/fraud/center.html
- **Transunion:** P.O. Box 2000 Chester, PA 19016-2000, 1-800-916-8800, or by visiting: https://www.transunion.com/fraud-alerts

**Request a Security Freeze:** You have the right to put a security freeze on your credit file at no cost. A security freeze will ensure potential creditors and other third parties are unable to access your credit report without your consent to lift the freeze. As a result, a security freeze may interfere with or delay approval of any subsequent request or application you make regarding a new loan, credit, mortgage, or any other account involving the extension of credit. Unlike a fraud alert, you must separately place a security freeze on your credit file with each consumer reporting agency. Pursuant to federal law, you cannot be charged to place or lift a security freeze.

In order to request a security freeze, you will need to provide some or all of the following information to the consumer reporting agency, depending on whether you do so online, by phone, or by mail:

1. Full name (including middle initial as well as Jr., Sr., II, III, etc.);
2. Social Security number;
3. Date of birth;
4. If you have moved in the past five (5) years, the addresses where you have lived over the prior five years;
5. Proof of current address, such as a current utility bill, telephone bill, rental agreement, or deed;
6. A legible photocopy of a government issued identification card (state driver's license or ID card, military identification, etc.);
7. Social Security Card, pay stub, or W2;
8. If you are a victim of identity theft, include a copy of either the police report, investigative report, or complaint to a law enforcement agency concerning identity theft.

Should you wish to place a security freeze, please contact the three major consumer reporting agencies listed below:

| Equifax Security Freeze | Experian Security Freeze | TransUnion Security Freeze |
|---|---|---|
| P.O. Box 105788 | P.O. Box 9554 | P.O. Box 160 |
| Atlanta, GA 30348-5788 | Allen, TX 75013 | Woodlyn, PA 19094 |
| 1-888-298-0045 | 1-888-397-3742 | 1-800-916-8800 |
| https://www.equifax.com/personal/credit-report-services/ | https://www.experian.com/freeze/center.html | https://www.transunion.com/credit-freeze |

After receiving your freeze request, each credit bureau will provide you with a unique PIN or password and information on how you can remove the freeze in the future. Keep the PIN or password in a safe place as you will need it if you choose to lift the freeze. A freeze remains in place until you ask the consumer reporting agency to temporarily lift it or remove it altogether. If the request is made online or via phone, a credit bureau must lift the credit freeze within an hour. If the request is made by mail, then the bureau must lift the freeze no later than three business days after receiving your request.

**Additional Information:** You can obtain information from the consumer reporting agencies, the FTC, or from your respective state Attorney General about fraud alerts, security freezes, and steps you can take toward preventing identity theft. You can contact the FTC to learn more about how to protect yourself from becoming a victim of identity theft at: Federal Trade Commission, Consumer Response Center, 600 Pennsylvania Avenue, NW, Washington, DC 20580, 1-877-IDTHEFT (438-4338) and TTY: 1-866-653-4261, www.identitytheft.gov/. The FTC also encourages those who discover that their information has been misused to file a complaint with them. You can obtain further information on how to file such a complaint by way of the contact information listed above. You have the right to file a police report if you ever experience identity theft or fraud.

Engagement # 5087587

**TMX Finance LLC:** TMX Finance LLC, located at 15 Bull Street, Suite 200 Savannah, GA 31401 can be reached at: 888-485-3629.

*California Residents:* Visit the California Office of Privacy Protection (www.oag.ca.gov/privacy) for additional information on protection against identity theft.

*Maryland Residents:* You may also obtain information about preventing and avoiding identity theft from the Maryland Office of the Attorney General: Maryland Office of the Attorney General, Consumer Protection Division, 200 St. Paul Place, Baltimore, MD 21202, (410) 528-8662 or (410) 576-6491, or visit http://www.marylandattorneygeneral.gov/.

*New York Residents:* You may also contact the following state agencies for information regarding security breach response and identity theft prevention and protection information: New York Attorney General Consumer Frauds & Protection Bureau, (800) 771-7755, https://www.ag.ny.gov and or New York Department of State's Division of Consumer Protection, (800) 697-1220, https://www.dos.ny.gov.

*North Carolina Residents:* You may also obtain information about preventing and avoiding identity theft from the North Carolina Attorney General's Office: North Carolina Department of Justice, Consumer Protection Division, 9001 Mail Service Center, Raleigh, NC 27699-9001, (919) 716-6000, www.ncdoj.gov.

*Oregon Residents:* State laws advise you to report any suspected identity theft to law enforcement, as well as the Federal Trade Commission. Contact information for the Oregon Department of Justice is as follows: Oregon Department of Justice, 1162 Court Street NE, Salem, OR 97301-4096, (877) 877-9392, www.doj.state.or.us.

*Rhode Island Residents:* You have a right to file or obtain a police report related to this incident. You may also obtain information about preventing and avoiding identity theft from the Rhode Island Office of the Attorney General: Rhode Island Office of the Attorney General Consumer Protection Division, 150 South Main Street, Providence, RI, 02903, (401) 274-4400, www.riag.ri.gov. There are approximately 52 Rhode Island residents impacted by this incident.

*All US Residents:* Identity Theft Clearinghouse, Federal Trade Commission, 600 Pennsylvania Avenue, NW Washington, DC 20580, www.consumer.gov/idtheft, 1-877-IDTHEFT (438-4338), TTY: 1-866-653-4261. https://www.consumerfinance.gov/consumer-tools/credit-reports-and-scores/

**You also have certain rights under the Fair Credit Reporting Act (FCRA):** These rights include to know what is in your file; to dispute incomplete or inaccurate information; to have consumer reporting agencies correct or delete inaccurate, incomplete, or unverifiable information; as well as other rights. For more information about the FCRA, and your rights pursuant to the FCRA, please visit https://files.consumerfinance.gov/f/201504_cfpb_summary_your-rights-under-fcra.pdf.

NOTICE: This correspondence is sent only for informational purposes and/or for the purpose of compliance with the loan documents and/or applicable law. You may be afforded certain protections under the United States Bankruptcy Code. By this correspondence, we are not attempting to collect a debt, impose personal liability, or in any way violate the provisions of the United States Bankruptcy Code. For any questions related to the bankruptcy, please contact your bankruptcy attorney.

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Dewayne Jackson

### DEFENDANTS

TMX Finance LLC and TMX Finance Corporate Services, Inc.

**(b)** County of Residence of First Listed Plaintiff    Colquitt
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Chatham
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Rebecca Franklin Harris, FRANKLIN LAW, LLC
2250 E. Victory Dr., Suite 102, Savannah, GA 31404
912.335.3305

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☒ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), 28 U.S.C. § 1391(b)(2)

Brief description of cause:
Class Action

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ 5,000,000.00

CHECK YES only if demanded in complaint:

JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE   see attached list of related actions    DOCKET NUMBER

DATE   04/13/2023

SIGNATURE OF ATTORNEY OF RECORD   /s Rebecca Franklin Harris

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

*Dewayne Jackson v. TMX Finance, LLC, et al.*

List of related actions

| | |
|---|---|
| 4:23-cv-00076-WTM-CLR | - Kolstedt v. TMX Finance Corporate Services, Inc. |
| 4:23-cv-00078-RSB-CLR | - Ross v. TMX Finance Corporate Services, Inc. et al |
| 4:23-cv-00080-WTM-CLR | - Domino v. TMX Finance Corporate Services, Inc. |
| 4:23-cv-00081-RSB-CLR | - Pickens v. TMX Finance Corporate Services, Inc. |
| 4:23-cv-00083-WTM-CLR | - Trottier v. TMX Finance Corporate Services, Inc. |
| 4:23-cv-00084-WTM-CLR | - Ritter v. TMX Finance Corporate Services, Inc. et al. |
| 4:23-cv-00085-WTM-CLR | - Oltean v. TMX Finance Corporate Services, Inc. |
| 4:23-cv-00088-WTM-CLR | - Carder v. TMX Finance Corporate Services, Inc. et al |
| 4:23-cv-00089-RSB-CLR | - Eslinger v. TMX Finance LLC et al. |
| 4:23-cv-00093-RSB-CLR | - Rodriguez v. TMX Finance Corporate Services, Inc. et al. |
| 4:23-cv-00094-RSB-CLR | - Coria v. TMX Finance Corporate Services, Inc. |
| 4:23-cv-00095-RSB-CLR | - Williams v. TMX Finance Corporate Services, Inc. |
| 4:23-cv-00096-RSB-CLR | - Johnson et al v. Jackson et al |
| 4:23-cv-00097-RSB-CLR | - Eimert v. TMX Finance Corporate Services, Inc. et al. |