IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

SAVANNAH KOLSTEDT, et al.,        )
                                  )
         Plaintiff,               )
                                  )
    vs.                           )      CASE NO. 4:23-CV-76
                                  )
TMX FINANCE, LLC,                 )
                                  )
         Defendant.               )
---------------------------

TRANSCRIPT OF FINAL APPROVAL OF CLASS SETTLEMENT HEARING
**BEFORE THE HONORABLE R. STAN BAKER**
United States Courthouse
8 Southern Oaks Court
Savannah, GA
August 12, 2025

COURT REPORTER:    Kelly A. McKee, CCR, RMR, CCP, RDR
                   United States Court Reporter
                   P.O. Box 8286
                   Savannah, GA  31412
                   912-650-4065

    (Proceedings reported by mechanical stenography, transcript produced by computer-aided transcription.)

2

APPEARANCES OF COUNSEL

FOR THE PLAINTIFFS:

    AMY E. KELLER, Esq.
    DICELLO LEVITT, LLP
    Ten North Dearborn Street, Sixth Floor
    Chicago, IL 60602
    312-214-7900
    Email:  akeller@dicellolevitt.com

    KELLY K. IVERSON, Esq.
    LYNCH CARPENTER, LLP
    1133 Penn Avenue, 5th Floor
    Pittsburgh, PA 15222
    412-322-9243
    Email:  kelly@lcllp.com

    MARYBETH V. GIBSON
    GIBSON CONSUMER LAW GROUP, LLC
    4279 Roswell Road, Suite 208-108
    Atlanta, GA 30342
    678-642-2503
    Email:  marybeth@gibsonconsumerlawgroup.com

    THOMAS A. WITHERS, Esq.
    WITHERS LAW FIRM, PC
    8 East Liberty Street
    Savannah, GA 31401
    912-447-8400
    Email:  twithers@witherslawfirmpc.com

    REBECCA FRANKLIN HARRIS, Esq.
    FRANKLIN LAW, LLC
    2919 River Drive
    Thunderbolt, GA 31404
    912-335-3305
    Email:  rebecca@franklinlawllc.com

FOR THE DEFENDANT:

    DONALD HOUSER, Esq.
    GAVIN REINKE, Esq.
    ALSTON & BIRD LLP
    One Atlantic Center
    1201 West Peachtree Street
    Atlanta, GA  30309-3424
    404-881-7000
    Email:  donald.houser@alston.com
    Email:  gavin.reinke@alston.com

3

**P R O C E E D I N G S**

**(Call to order at 10:15 a.m.)**

THE COURT:  Good morning, everyone.

Ms. Hammock, please call our case.

THE CLERK:  Yes, sir.  Case Number 4:23-CV-76, Savannah Kolstedt and others vs. TMX Finance Corporate Services, Incorporated and TMX Finance, LLC.

THE COURT:  Are we ready for the plaintiffs?

MS. IVERSON:  Yes, Your Honor.  Kelly Iverson with Lynch Carpenter on behalf of the plaintiffs.

MS. GIBSON:  MaryBeth Gibson at Consumer Law Group on behalf of the plaintiffs.

MS. KELLER:  Amy Keller, DiCello Levitt, LLP, also on behalf of the plaintiffs.

MR. WITHERS:  And Tom Withers on behalf of the plaintiffs.

MS. HARRIS:  Rebecca Harris on behalf of the plaintiffs.

THE COURT:  Thank you, Counsel.  And the defendant?

MR. HOUSER:  Good morning, Your Honor.  Donald Houser with Alston & Bird on behalf of the defendants.

MR. REINKE:  Good morning, Your Honor.  Gavin Reinke, also with Alston & Bird, on behalf of the defendants.

THE COURT:  Very good.  Thank you.  Well, a lot of times when I come out here we have a lot of work to do because no one's done a lot of work in advance.  That is not the case

4

today.  I've got a lot of work that you all have clearly done in advance of the hearing today.

I think everything is in good order, but of course, we always have a hearing on these types of motions because of the importance of these motions as well as the importance of having a public venue where those who may object to it, give them one last opportunity to object.

That being said, I've read all the documents that have been filed in the case.  It's the plaintiffs' motion, so I want to turn it over to plaintiffs' counsel to provide the Court support for the motion.  You may, at the lectern.

MS. IVERSON:  Thank you, Your Honor.  Again, Kelly Iverson for the plaintiffs; and if it's okay with Your Honor, I believe we have this divvied up here, and I will address the final approval motion, and the attorneys' fees petition to be addressed by my co-counsel, MaryBeth Gibson.

THE COURT:  Very good.

MS. IVERSON:  Okay.  And, Your Honor, we were in front of you, I believe by -- remotely for the preliminary approval hearing, and you had given us some suggestions of flushing out some of the *Bennett* factors when we got to final approval.  It sounds like you've had the opportunity to review our briefing, and we did take the opportunity to address those questions.  And I -- if you'd like, I can go through each factor, or if you have certain questions that you'd like us to address, I'm happy to

handle it however works best for you.

THE COURT:  I don't, but I would like you just to go ahead and make the record of -- you don't have to go as in detail as you did in the brief, but briefly as to each factor. Thank you.

MS. IVERSON:  Absolutely.  So this settlement includes various options of relief for the settlement class.  They could file a claim for a cash payment with no documentation for losses for a $35 payment.

They could file a claim for documented out-of-pocket losses up to $500.  And without filing a claim, any class member that has debt with TMX would get an automatic reduction of $20 or up to $20 on their debt.  And that was if they did not file a claim.

The defendants have also agreed to certain security enhancements, data security enhancements, which are set forth in the settlement agreement on Page 26 with requirements to change passwords, have, you know, passwords be more secure, certain policies, multifactor authentication, separation of duties and privileges in the permissions, encryption requirements, things of this sort.

Your Honor, after preliminary approval, the settlement administrator, Simpluris, provided notice, consistent with the settlement agreement.  They've submitted a declaration with our initial final approval papers, and yesterday we submitted a

6

supplemental declaration from Simpluris that you should have received.

They -- the notice plan was able to reach 98.9 percent of the class, which is a fantastic rate for notice. The supplemental declaration was to inform the Court of additional opt-outs, but there have been zero objections, no objections to the settlement.

THE COURT: So we're still at 26 opt-outs; correct?

MS. IVERSON: We are at 71 opt-outs.

THE COURT: My mistake. 71. Thank you.

MS. IVERSON: Yes. So there was a declaration filed yesterday where there was an issue that was caught by Simpluris with their delivery report from the post office that paused (ph) for inaccuracies in how the sorting intake and upload process for the opt-outs and objections, except there were no objections, were processed.

Donald Houser, opposing counsel and I, spoke with Shelby Alvey at Simpluris on Sunday, and as we understand, they elevated the issue to the highest level they could, actually flew someone out who hand sorted through everything with the post office and were able to confirm that they are confident that anything that was missed has now been addressed and that the total opt-outs are 71 opt-outs, which is less than a quarter of one percent of the class. So I think Judge Thrash called it an infinitesimal number, right, a percentage.

7

So, Your Honor, 23(e) requires that we look at the *Bennett* factors which overlap -- I'm sorry.  The circuit looks at the *Bennett* factors which overlap with 23(e)(2) factors as well.

The question is the likelihood of success at trial, the range of possible recoveries, the point where the range of recoveries of the settlement is fair, adequate and reasonable; complexity, expense and duration of litigation; substance and amount of opposition to the settlement, and the stage of the proceedings at which the settlement was achieved.

Again, those overlap with the 23(e)(2) factor to some degree.  Those have been outlined in our brief, but here, we did face certain hurdles in this case with the motion to compel arbitration that was filed and the arbitration provisions and whether this court would find that, you know, a vast majority of the class was bound to arbitrate and potentially had agreed to not proceed with any class action under their agreements.

That -- a recent decision out of the Fourth Circuit in *Marriott* just upheld a class waiver in a class case and reversed class certification based upon the class waiver.

While we certainly -- there are certainly a subset of the class that had not signed any kind of arbitration agreement, there was that vast majority that did that was certainly a risk for proceeding with the class action and for getting recovery for the entire 4.8 million individuals in the class.

8

Range of recovery, and, Your Honor, these cases, they've not been to trial.  It's very difficult.  You can't go out like a personal injury case and say, hey, how much is it worth when this person has lost an arm because of somebody else's negligence.  You know, there have been damage analysis done for the purposes of class certification, but those are methodologies, typically, of how we should look at the damages and prove damages on a class-wide basis.

In the *Brinker* case, which was certified and went up to the Eleventh Circuit in 2023, the damage methodology included like a standard dollar amount for lost opportunity to accrue reward points on the credit cards, because that was a data breach with respect to the cardholders.  Then they had a value of the cardholder time and out-of-pocket damages.

Now, of course, the out-of-pocket damages can vary for each of the class members, and the *Brinker* report said, you know, that wasn't prohibited to class certification, the variance with the damages, but it's not something that's been tested.  However, there are a lot of settlements that have been approved in data breach cases, and so we do have a lot of data on what these cases typically settle for.  And, you know, when you look at whether our case and the value that we've brought to the class falls within there, we are well within that range, if not above the range.  Ultimately we wind up with about $8.80 per class member when you look at the 4.8 million class members.

9

We also have, because of the automatic --

THE COURT:  Does that vary based upon which relief they seek?  I mean, again, I know all of this is hard to value, but you mentioned the topic, that there are different options they have of what they can avail themselves of.  Does that vary based on what they avail themselves of?

MS. IVERSON:  So, yes, it does vary based upon what they avail themselves of.  They have an opportunity to do documented out-of-pocket losses and be able to get additional money based upon that, right?  Or they can just take the $35 payment, or if they don't file a claim, they're going to get the debt relief.  So when you say the $8.80, when we look at these settlements, we say, here's the total value of the settlement; here's the total class members; here's the value per class member.  It's not meaning every single class member ultimately gets the $8.80, because here, you have to -- you know, some are going to get more than that because they filed claims for their out-of-pocket losses --

THE COURT:  But the class member retains some control over --

MS. IVERSON:  Correct.

THE COURT:  -- what would be more valuable to that individual class member?

MS. IVERSON:  Exactly.  Absolutely.  And so they have a choice to do nothing if they owe debt and still get that debt

10

relief, and with that debt relief, with the claims that came in, it's going to be about 30 percent of the class that winds up with some form of relief, which is a very, very high percentage for these cases.

The complexity expense and duration of the litigation, obviously, you know, class action, these are complex cases with the data breach, a lot of IT and experts and what have you involved.

Here, we went through the process of getting 408 -- Rule 408 discovery and got substantial documentation from the defendants to be able to understand what occurred, what was affected and understand what the class looked like, what data was affected in order to have our mediation with Judge Welsh and be able to come up with this settlement in an informed manner.

The opposition to the settlement, as I said, there have been no objections to the settlement, and there have been 71 opt-outs, which is minimal.

And I guess I -- I do believe before we started I was supposed to let you know that we did get a call this morning -- MaryBeth Gibson got a call this morning from a class member who said they were on their way to come to the hearing, but were running 45 minutes late, Your Honor.  She let them know that they did not need to come.  This is not anybody that objected to the settlement, and we're not sure if she was unclear.  She didn't raise objections on the phone, just kind of said she was

11

planning on coming.  We let her know it wasn't necessary.  We're not sure if she's still on her way, but she certainly might show up here in 45 minutes at the court --

THE COURT:  Fair enough.

MS. IVERSON:  -- and we told her that the hearing would probably be over by the time she got here.

THE COURT:  Understand.  Well, I'll certainly sound the alarm for that before we close the hearing, if there's anybody who wants to be heard.  Thank you for letting me know that.

MS. IVERSON:  And then stage of proceedings at which the settlement was achieved.  Obviously this settled early, and our federal courts appreciate early settlement, but it wasn't done in any way that wasn't informed by substantial, you know, informal discovery that went on between the parties, including plaintiffs submitted 408 documents in responses to the defendant as well.

Your Honor, the class representatives and the class counsel have adequately represented the class.  Obviously we have vigorously prosecuted this litigation.  We went through a lot of the briefing before we got to the settlement.  I believe all the motion to dismiss briefing was teed up whenever we reached the settlement, and the class representatives have shown a lot of support for the settlement.

We have certain settlement class representatives that are receiving debt relief as well.  In addition to their

12

participation in the -- with the claims, they're able to have their debt relieved, and they are providing a full release as opposed to the more limited release that other settlement class members are providing.

We already discussed that this was negotiated at arm's length, with Judge Welsh being our mediator, and even after mediation it took us a substantial amount of time with us going back and forth with defense counsel to ultimately reach this settlement. And the proposal does treat the class members equitably relative to each other.

As you already said, Your Honor, of course, if there are additional out-of-pocket losses documented, the class members are able to obtain more and get that covered, or they can choose which bucket that they want to fall into.

Do you want me to go through the 23(a) and (b) factors -- I think you already addressed those on the preliminary approval -- numerosity, commonality, et cetera?

THE COURT: I do not need you to go through them today, because like you said, we've already addressed them; you've briefly continued to touch on them, and I don't see anything that would make me reconsider the findings I've had on all of that.

MS. IVERSON: Okay. Did you have any questions on any of the 23(e) factors?

THE COURT: I do not. I do not. Well, I guess I would

13

ask, you know, and this goes somewhat to my question earlier about class members choosing relief.  Do you know percentage wise or numbers wise which class members have chosen which or what indication you have at this point of where that will be?

MS. IVERSON:  So there was -- the class members elected both the undocumented as well as the documented losses.  There's been about 46,000 claims that were submitted.  I think it's 45,960 claims that were submitted.  That was the most recent update that we received as of today.

A number of the ones that were submitted to bucket two are -- received deficiencies after the claims period because a lot of them came in without any kind of documentation.  And so we will not know until after those deficiencies are cured or not cured whether they are going to ultimately be valid.  There were a few that were deficient because they didn't show enough relation to the data and the data breach at issue here.

And so the settlement administrator has been tasked, obviously, in the settlement agreement, with making the determinations ultimately about whether those claims are valid.

THE COURT:  Right.

MS. IVERSON:  But -- and there was about 1.6 million individuals who are going to receive the automatic debt relief, which is -- I refer to as bucket three.  So that ultimately brings it to just over that 1.6 million individuals out of the 4.8 that are obtaining and getting relief directly from the

14

settlement.

THE COURT:  Very good.  Thank you.  I'll hear now any response that the defense wants to provide on that issue. Obviously you don't have to, Mr. Houser, but is there anything you want to respond to?

MR. HOUSER:  No, Your Honor.

THE COURT:  Very good.  Thank you.  So we'll turn now to the motion for the fees.  I should say fees and expenses, Doc. 162.

MS. GIBSON:  Yes.  Thank you, Your Honor.  MaryBeth Gibson.  On June 23rd, 2025, plaintiffs filed their motion for an award of reasonable fees and expenses, and pursuant -- today, pursuant to Rule 23(b) and 54(d)(2), we are asking the Court to award less than 13.4 percent of the total settlement value in cash or debt relief as the attorneys' fees.  Plaintiffs request the Court approve an award of 5.75 million in fees and expenses.

As discussed earlier, the settlement includes documented out-of-pocket losses up to $500 with a two-million-dollar cap, undocumented losses or harm at $35 per class member, up to 4.5-million-dollar cap, and then debt reduction for non claimants, up to $20 per person, and we understand that's approximately 1.6 million people, valued at 34 million dollars. So these buckets plus counsels' fee requests and expenses provide a total settlement value of approximately $46,250,000. So the fee request is less than 13.4 percent of the settlement

15

value.

Importantly, in coming to this total figure, courts have included debt forgiveness in assessing a settlement's total value.  In Leslie vs. Redstone Credit Union, which is a Northern District of Alabama decision in 2023, the Court held that the total value of the settlement included the combined value of the common fund monetary relief and the debt forgiveness that the settlement provided the class.  And the Court in that case awarded one-third of the settlement value in attorneys' fees to class counsel.

Second, the courts also include class counsels' fee and expense request as part of the total settlement value in determining an award of fees.  In *DeSouza vs. Aerocare*, which is a Middle District of Florida decision in 2024, the Court, relying on *In Re: Home Depot*, confirmed that using the, quote, constructive common fund approach where fees were paid outside of the fund is appropriate because in that instance a cap on the fees was negotiated making it different than an agreement where fees are not addressed at all.

Similarly, here, in 16.1, Paragraph 16.1 of the settlement agreement, the parties negotiated a cap for the fee request after the substantive terms of the settlement agreement were reached.

So in the Eleventh Circuit the controlling case for awarding of fees is *Camden*, one, which provides that attorneys'

16

fees in common-fund cases are calculated based on using a percentage of the fund.  In the Eleventh Circuit, when analyzing fees, courts -- the Eleventh Circuit uses the 12 *Johnson* factors from *Johnson vs. Georgia Highway*.  District courts in our district have decided that in assessing a settlement, not all 12 factors need to be evaluated, but there are six factors that a court does consider in determining the reasonableness of a fee request.

And I'm happy to run through those right now.  We addressed them in our motion, but real quickly, these factors include the results obtained in fees in similar cases.  Here, the settlement is a very good case -- a very strong settlement, providing cash and/or debt relief to 4.8 million settlement class members.  The settlement provides every settlement class member with a valid form of monetary relief.  And this is very good considering the risk that my co-counsel talked about at class certification, summary judgment, considering the risk of the arbitration provision and class waiver.

So taking all these benefits into account, this is a very good settlement for the class.

The second factor is the novelty and difficulty of the questions involved, which my co-counsel also briefly addressed, but data breach cases involve complex unique facts.  It is evolving, especially in this circuit.  We have adverse decisions from other circuits that defense counsel would likely raise.

17

We faced a plethora of legal questions regarding whether Titlemax had a common-law duty to safeguard personal data, whether the FTC Act provided the basis for a negligence per se claim.

We also confronted difficult factual questions regarding, you know, what data was accessed and stolen, what sensitive information might be available for sale on the dark web.  So these issues also weigh in favor of this settlement.

The third factor is the preclusion of other work by class counsel.  Here, this case has been going on for over two years, and during that time class counsel has not accepted other work because of their focus of their energy on this case.  So this factor also weighs in favor of an approval of the fee request.

The next factor, the fourth factor, is whether the fee is fixed or contingent.  Here, it is a contingent fee, and courts have held that the -- a fair fee must include consideration of the factor that counsel took the case with the risk that they might receive nothing.  We took it on a wholly contingent basis, without any guarantee of recovery, advancing litigation costs and pursuing the case on behalf of the settlement class.

The next factor is the experience, reputation and ability of class counsel.  As explained in our leadership application and in our declarations, the co lead class counsel,

18

our liaison and our chair of the committee, as well as our PFC, all have experience in litigating class actions, and most of us have vast experience in data breach class actions.  So this factor also weighs in favor of approval.

Finally, the time and labor required.  Class counsel spent a lot of time investigating the data breach, the facts surrounding the data breach, litigating briefing motions.  As of the time of the filing of our motion for the fee application, we had expended over 3,000 hours.  But we also moved the case forward with diligence and efficiency, and so that is also to be taken into account when considering the application for fees and expenses.

So those are the *Johnson* factors.  The Courts also consider the number of objections to a settlement, and here there have been none, which is very good.  And then the Courts also consider the risks undertaken by counsel in pursuing the litigation, and that does overlap with the *Johnson* factors. Here, class counsel undertook substantial risk in pursuing the case on behalf of the class.

So those factors all weigh in support of approving class counsels' application for fees.

We also submitted, as part of the fee request, an application for expenses that are presently approximately $54,000, and this is part of the global request for fees.  These expenses were incurred for the benefit of the class and should

19

be included in the expense and fee award by the Court.

So all relevant *Johnson* factors, Your Honor, support the Court entering an order approving the application for reasonable fees and expenses. And I don't know if you have any questions. I'm happy to answer them.

THE COURT: I don't. I was just taking notes on your presentation. It seems like you covered all those in addition with the brief. I don't have any questions.

MS. GIBSON: All right. Thank you, Your Honor.

THE COURT: Thank you. Any response from defense counsel?

MR. HOUSER: No, Your Honor. We don't oppose plaintiffs' motion. I did want to flag one point about the settlement agreement is that part of the settlement agreement, Exhibit F, was a proposed final approval order. It was not resubmitted with the motion for final approval. So I just wanted to flag that for Your Honor that if Your Honor grants final approval, we would respectfully request a final approval order materially in the form of Exhibit F in the settlement agreement.

THE COURT: Okay. And it was filed today at Doc 149-1; is that correct?

I'm sorry. It was filed previously at Doc 149-1, which is all the way back in February 27. I just was handed it.

So tell me about the proposed final order. I think it

20

was filed recently as Exhibit A.  But -- it was filed recently.

I said as Docket Exhibit A.  There's an Exhibit A that I have to

it.  But tell me more about the final settlement proposed order.

MS. IVERSON:  Your Honor, Kelly Iverson again for

plaintiffs.  We emailed, I believe, Robin Jenkins from

Mr. Withers' office, emailed a Word version of this proposed

final approval order, as well as the Exhibit A, which lists the

71 opt-outs, to the Court this morning.

I do have for you, if you'd like it, the blanks of what

should be filled in.  We're also happy to fill in those blanks

and resend the Word version with the blanks filled in, if

that's Your Honor's preference.

THE COURT:  Okay.  Very good.  Thank you.  A copy of the

release, it can be found at Doc. 149-1; is that correct?

MS. IVERSON:  It's 149-1.  It's Pages 94 through 104 of

the 104 pages, because it was an attachment to the settlement

agreement.

THE COURT:  Mr. Houser, do you have any problem -- I was

not quite grasping, because I was looking at doc. numbers when

you were -- to be candid, when you were telling me about the

form.

MR. HOUSER:  Sure.

THE COURT:  Are you fine with the form that's been

provided or do you want some prior form of the order?

MS. IVERSON:  It's the same.

21

MR. HOUSER:  I'm fine with what they have submitted, Your Honor.

THE COURT:  Okay.

MR. HOUSER:  Thank you.

THE COURT:  It's the same --

MR. HOUSER:  It's the same.  It should be the same that was attached to the exhibit.  I think they have -- I think we resubmitted the settlement -- the entire settlement package after that initial conference, and that would have been an exhibit to the settlement.  That did not change.  And then what I believe that they submitted this morning was simply the same document that was previously submitted with -- maybe as a Word version.  I have not -- I did not see that, but...

MS. GIBSON:  It is not a Word version, but Ms. Hammock asked that we submit it in Word, and we can do that.  It also contained the list of opt-outs --

MR. HOUSER:  Yes.

MS. GIBSON:  -- as an exhibit to that.

MR. HOUSER:  Great.

THE COURT:  Okay.  Very good.  Thank you.

MR. HOUSER:  Thank you, Your Honor.

MS. IVERSON:  And then do you want me to give you the dates and everything that should be filled in or do you want us to email that to you?

THE COURT:  I'll get to that in just a sec.  Thank you

22

very much.

Thanks for flagging it for me, though.

All right.  Are there any persons present who wish to be heard regarding the motions before the Court on approval of the application of payment of class counsel, attorneys' fees and expenses, as well as the unopposed motion for final approval of class action settlement and final certification of settlement class?  Any persons who wish to be heard?

Okay.  No one has wished to be heard on that.  I'm going to grant both of these unopposed motions.  The pleadings in this case have been exemplary.  What you've gone through in detail in your briefing, as well as what you've gone through in your oral presentation, has been extremely organized and has addressed all the things that the Court needs to address.

The proposed order is in good shape, except for a few things.  We do need the blanks filled in.  We do need a citation, at least once, directing the readers to where the executed copy of the release can be found.  So let's include that in the proposed order.  And then update it, any revisions necessary, particularly in Paragraphs 7 and 8, for instance. There have been zero objections filed.  Sounds like there aren't any.  So the order should not read, "The Court has considered all objections and finds..." because that would cause someone to be confused looking back that there were objections, but then later in the order we say there were none.  So let's make sure

23

of that.

I've specifically reviewed Paragraph 25.  It's a little different than what we typically see, but find it's on good standing, and the law cited therein is appropriate.

Okay.  So that's all we need from you all is this proposed order with those blanks filled in; a citation, at least once, directing readers to where the executed copy of the release can be found, and those revisions that are necessary to particularly Paragraphs 7 and 8, making certain that everybody is aware there are no objections.  And any other typos or anything else that you may find, go ahead.

Make sure that you send that to opposing counsel first, let opposing counsel see it, and make sure that Mr. Houser can comment on anything that needs to be changed, and you can present it to the Court.  Okay.

Did you all have something you needed to discuss beforehand?  Go ahead.

MS. GIBSON:  No.  No, Your Honor.  Not from plaintiffs.

MR. HOUSER:  No.

THE COURT:  Okay.  Very good.  The way that you will present that to the Court is just email a Word version to Mrs. Hammock.  You don't need to file the proposed order on the docket because we're not changing it in any material way, other than what I've announced in open court, and there are no objections.  So I'm fine with you just emailing Mrs. Hammock a

24

Word version.

Normally I like a PDF proposed order on the docket so everybody knows what we're doing, and then an emailed Word version to Mrs. Hammock, but here we just need the emailed Word version.  All right.

Give me just one moment.

All right.  Anything further from the plaintiffs at this time?

MS. GIBSON:  No, Your Honor.  Thank you.

THE COURT:  Anything on behalf of the defendants?

MR. HOUSER:  No, Your Honor.

THE COURT:  All right.  We hope all of our hearings today go this smooth, or unopposed just like this was.  That's probably a wish that's not going to come to fruition, but thank you all for your diligent work on this case.

The motions are granted.  I just need the proposed orders, and we'll get those entered.

Counsel, you're excused with the Court's appreciation. We'll prepare the courtroom for our next hearing.

ALL:  Thank you, Your Honor.

(Proceedings concluded at 10:47 a.m.)

- - -

25

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly A. McKee, Registered Diplomate Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the Southern District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 27th day of September 2025.

*Kelly A. McKee*
_____
KELLY A. McKEE, CCR, RMR, CCP, RDR

#2731